IN THE UNITED STATES DISTRICT COURT
FOR NEBRASKA

| | |
|---|---|
| TONIA ACKERMAN and DENNIS ACKERMAN, | CASE NO. 8:17-CV-209 |
| Plaintiffs, | |
| v. | **PLAINTIFFS' MEMORANDUM OF AUTHORITIES IN RESISTANCE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| U-PARK, INC., | |
| Defendant. | |

COME NOW Plaintiffs, Tonia Ackerman and Dennis Ackerman, by and through their undersigned counsel, and pursuant to Rule 56 of the Federal Rules of Civil Procedure, provides the following memorandum of authorities in support of their resistance to Defendant's motion for summary judgment.

TABLE OF CONTENTS

I.    INTRODUCTION ........................................................ 2

II.   LEGAL STANDARDS ................................................ 2

III.  RELEVANT FACTS .................................................. 3

IV.   ARGUMENT............................................................ 27

    A.    Relevant Nebraska Law...................................... 28

    B.    Defendant Knew or should have Known of this Defective Condition in the Asphalt and the Resultant Black Ice............................... 28

        1.    Defendant knew or should have known of the bird bath defect 29
        2.    Defendant knew or should have known of the resultant black ice ......................................................... 31

    C.    Defendant Contributed to Creation of Defective Condition................ 33

    D.    Additional Evidence Allows a Jury to Infer Defendant was Negligent in Parking Lot Maintenance ................................... 35

V.    CONCLUSION.......................................................... 36

## I.     INTRODUCTION

This case arises out of the negligence of Defendant U-Park, Inc. (U-Park) in the asphalt maintenance and snow/ice removal of a parking lot, Lot 13, located near the CenturyLink Center in Omaha, Nebraska.  Defendant's motion for summary judgment should be denied because material disputes exist as to (1) whether Defendant would have discovered the defective condition by exercising reasonable care, (2) whether Defendant created the defective condition, and (3) whether Defendant exercised reasonable care in the maintenance and snow/ice removal of Lot 13.

## II.     LEGAL STANDARDS

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Id*.  "[T]he substantive law will identify which facts are material." *Id*.  "The movant bears the initial responsibility of informing the district court of the basis for its motion and must identify the portions of the record that it believes demonstrate the absence of a genuine dispute of material fact."  *Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir.

2018) (citing *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc).

"An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). In reviewing the record, the Court views the record "in the light most favorable to the nonmoving party." *Id*. All reasonable inferences from the facts should be drawn in favor of the nonmoving party. *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). Further, because the Court views "the facts in the light most favorable to the non-moving party, [the Court does] not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004) (citing *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir.1996)).

## III.   RELEVANT FACTS

Pursuant to Local Rule 56.1, a response to the Defendant's statement of facts is below:

### A.   Plaintiffs' Response to Defendant's Statement of Material Facts

1.   The Plaintiffs' claims arise from an alleged slip and fall in a commercial parking lot in Omaha, Nebraska, managed by Defendant U-Park, Inc. (Complaint ¶¶ 7, 9; Answer ¶ 8) The Complaint alleges that Tonia Ackerman "slipped and fell on a patch of black ice that she was unable to see because it blended into the blacktop." (Complaint ¶ 9)

> **Response:  Undisputed.  Defendant's expert admits the ice was black ice.  *See* Swenson Depo at 50:4-16.**

2.      Joseph Schmitt is a part owner of U-Park, Inc., which owns several parking lots in the downtown Omaha area.   (Schmitt Dep. 12:19-24, 13:10-15, 26:23-27:4)  U-Park does not own the subject lot but leases the land from the owner and has operated it since 2005.  (Schmitt Dep.. 14:1-10, 15:1-6, 15:17-20)

**Response:   Undisputed.   Defendant, as possessor of the land, is responsible for any defective condition on the property and resulting harm to invitees.  *See Downey v. W. Cmty. Coll. Area*, 808 N.W.2d 839, 847 (2012).**

3.      As between U-Park and the lot owner, U-Park was responsible for snow removal and trimming grass around the exterior, but the owner was responsible for the condition of the asphalt surface and for resurfacing.  (Schmitt Dep. 16:16-17:14, 23:10-24)  The lot owner would take care of fixing potholes and cracks and putting slurry down.  (Schmitt Dep. 25:8-13)

**Response: Disputed.  Although Schmitt testified that U-Park was not responsible for asphalt surface and resurfacing, U-Park, as possessor of the land, had a duty to remedy defects that were dangerous to invitees.  In addition, Schmitt testified that he personally repaired the asphalt.  Schmitt did not testify that he performed repairs on behalf of 555 N. LLC and instead was testifying on behalf of U-Park and as an agent of U-Park.  As such, Schmitt admitted that he performed repairs on behalf of U-Park.  *See* Schmitt Depo at 38 ("I did a few -- filled a few holes there. And that's -- I think that's all that's been done.").  Schmitt testified that an underground electric cable was placed underneath the very area that this bird bath formed within.  *See* Schmitt Depo at 74:2-13, 75:14-24.  Moreover, Schmitt was intimately aware of this area as he marked it multiple times.  *See* Schmitt Depo at 75:19-24, 75:25-76:22, 79:21-25, 80:1-17.**

4.      U-Park would staff the lot to collect fees during events and had a person at the lot on the day of the subject incident.  (Schmitt Dep. 24:1-8)  During

the February 13, 2016 event Mrs. Ackerman had parked in the lot to attend, Schmitt was the lot attendant taking money.  (Schmitt Dep. 60:22-61:18)

> **Response:  Undisputed.  This is not a material fact.  No response is required as this is not a material fact.  A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).**

5.    Other than the claim made in the subject lawsuit, U-Park has never had a claim against it with respect to this particular lot and had never been sued before for injuries on this lot.  (Schmitt Dep. 33:3-12)

> **Response.  Undisputed.  However, no response is required as this is not a material fact.  A material fact is one "that might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).**

6.    The lot from which the Plaintiffs' claims arose was surfaced with asphalt.  (Schmitt Dep. 36:3-8)  On three occasions Schmitt performed physical repair of the asphalt on the lot by filling holes and once he hired someone to fill cracks.  (Schmitt Dep. 38:10-21, 39:22-40:6)

> **Response:  Undisputed**.

7.    Schmitt is the primary person for U-Park to handle snow removal. (Schmitt Dep.40:14-41:1) He also is the person who determines whether there is water that has turned to ice on the lot.  (Schmitt Dep. 104:21-25)

> **Response:  Undisputed as to snow removal.  Disputed as to Schmitt's actual performance in determining whether there is ice on the lot. *See* Schmitt Depo. 68:10-14.**

8.    Schmitt was at the subject parking lot "just about every day," and would "usually walk the whole lot, checking for – checking the cars, make sure that

people paid and then the condition of the parking lot." (Schmitt Dep. 104:4-11)  He

would usually make a physical inspection once on a normal day in the morning

when he arrived.  (Schmitt Dep. 105:1-8)

> **Response:  Disputed.  Schmitt's claimed practices are disputed.
> Schmitt's typical practices do not have any bearing on whether on
> the date in question, he did in fact walk the lot, and whether his
> actions were reasonable.  Schmitt testified that his primary reason
> for walking the lot is to check if people had paid.  *See* Schmitt Depo
> at 126:7-11 (Q. And when you say that you go there and you walk
> around the lot, you go there to walk around to make sure people
> have paid.  That's your main focus, isn't it? A. Right.) Disputed that
> Schmitt checked the parking lot on the date of Mrs. Ackerman's
> injries.  *See* Schmitt Depo. 68:10-14 (*Q. That's your typical routine.
> Can you tell us here sitting today under oath that you actually drove
> through the lot to check out the lot before you set up taking money? A.
> I cannot specifically say that.*)**

9.      Although Schmitt was not familiar with the term "birdbath" with

respect to asphalt surfaces, he reasoned that it means a depression and said there

were a few on the subject lot, caused by the tires of vehicles sinking in when the

asphalt is hot. (Schmitt Dep. 49:12-50:9)  He acknowledged that a depression in the

asphalt could fill with water or snow and become ice.  (Schmitt Dep. 52:2-11)

Schmitt disagreed that the area where the dark spot is shown in Dep. Ex. 5 is where

there is a birdbath condition on the lot.  (Schmitt Dep. 84:2-8)

> **Response:  Disputed.  Schmitt's reasoning, lack of knowledge, and
> cause of bird bath is disputed.  *See generally* Schmitt Depo lacking
> any qualification as to asphalt expertise.**
>
> **Disputed that the spot in question was a bird bath depression and
> defect in the asphalt.  *See* Wayne Depo at 49:17-25 (testifying that the
> spot where Mrs. Ackerman fell was a bird bath depression); Wayne
> Depo at 40:9 – 41:14 (testifying as to bird bath defects in asphalt
> parking lots).**

10.     On the day of the accident, February 13, 2016, Schmitt had arrived at the lot about 8 a.m. because of an event at the nearby CenturyLink Center. (Schmitt Dep. 67:5-15) His typical routine is to drive through the lot to make sure everything is in good shape, and "it was pretty clear that day." (Schmitt Dep. 68:1-9)

> **Response:  Disputed that Schmitt checked the parking lot or arrived at this time.  *See* Schmitt Depo. 68:10-14 (*Q. That's your typical routine. Can you tell us here sitting today under oath that you actually drove through the lot to check out the lot before you set up taking money? A. I cannot specifically say that.*)**

11.     Asked about the weather on the day of the fall, Schmitt said it was cold, but "there was no snow or anything." (Schmitt Dep. 72:20-73:3)  He described the parking lot as "real clear, I think.  The parking lot was real clean." (Schmitt Dep. 90:14-17)

> **Response:  Disputed that the parking lot was properly maintained. *See* Wayne Depo at 99:17-18.  Black ice was present on the property. *See* Wayne depo at 99:17-18 ("What we do know if there is water here); Depo Exhibit 5, Depo Exhibit 6; Wayne Depo at 84:13-18; Swenson Depo at 44:21-23, 50:4-16.**

12.     According to a Local Climatological Date Daily Summary sheet for February 2016, published by the National Oceanic & Atmospheric Administration, the last precipitation beyond a trace in the downtown Omaha area before February 13 had been 0.6 inches of snow on February 7. (Schmitt Dep. Ex. 13)

> **Response:  Disputed as to whether what is cited accurately describes the condition on the lot in question.**

13.    Before the incident, Schmitt did not know that there was ice in Stall 153.  (Schmitt Dep. 93:3-7, 124:24-125:3)  Because he did not know ice was in that spot, he did not take care of it before the incident.  (Schmitt Dep. 125:13-24)

**Response:  Disputed as to ability to remedy the spot and duty to find this ice spot.  *See* Wayne Depo at 85:15-17 (bird baths take years to develop); Wayne Depo at 96:22- 97:1 (Schmitt, as operator, should know where bird baths are located); Wayne Depo at 108:11-16 (it is reasonable for a lot operator to inspect the lot days after a weather event; Wayne Depo at 109:2-6 (Lot should be inspected daily during the winter months).  See also Schmitt Depo at 38:19-21 ("I did a few -- filled a few holes there. And that's -- I think that's all that's been done."); Schmitt Depo at 40:1-3 ("I believe we had like three holes that required filling.  One I filled with cement, and two with blacktop.")**

14.    He testified, "We don't know how that spot of water got there." (Schmitt Dep. 94:14-15)  He acknowledged the possibility that snow melted in the spot and froze over, but also said that "there could be a lot of other ways that the water could have got there." (Schmitt Dep. 95:1-8)  He testified that he still did not know as of the time of his deposition what caused the substance shown in Dep. Exs. 5 and 6.  (Schmitt Dep. 123:21-25)  He described some of the possibilities:

One thing I thought of, it could easily be exhaust from a car dripping down there if there was a truck there, I believe, parked earlier in the day. And also going to the CenturyLink, people are not allowed to take full water bottles in the CenturyLink. So some people dump those out, and then go in.

(Schmitt Dep. 124:6-14)

**Response:  Disputed as to where water that formed black ice came from.  Disputed as to veracity of testimony.  *See* Wayne Depo at 88:8-14; Schmitt Depo at 94:22-95:8, *see* Swenson Report at 12, 13, and 14.**

8

15.     Schmitt has no recollection of Mrs. Ackerman before her fall and did not see the fall, but was told that someone had fallen when an ambulance arrived. (Schmitt Dep.62:11-19, 65:1-9)  At that point he went to the site of the fall and saw Mrs. Ackerman lying on the asphalt.  (Schmitt Dep. 69:15-70:4)  She was close to Stall No. 153, which was the number of the last stall in the southeast corner of the lot next to a walkway.  (Schmitt Dep. 56:2-14, 70:21-71:4)

> **Response:  Disputed.  Mrs. Ackerman fell on a patch of black ice located in spot 153.  *See* Wayne depo at 99:17-18 ("What we do know if there is water here); Depo Exhibit 5, Depo Exhibit 6; Wayne Depo at 84:13-18; Swenson Depo at 44:21-23.**

16.     After Mrs. Ackerman was taken by the ambulance, Schmitt took Dep. Ex. 5, a photo of the area where she had been.  (Schmitt Dep. 70:21-71:4, 73:10-19) Dep. Ex. 5 shows a dark spot in Stall 153.  (Schmitt Dep. 73:20-22)  Schmitt took the photo before he put ice melt on the surface.  (Schmitt Dep. 82:12-21, 83:17-21) He testified that the dark spot was ice in Stall 153 before he put ice melt on it. (Schmitt Dep. 84:21-25)  Because he saw that it was ice after he learned of the fall, he went to get ice melt to put on the spot.  (Schmitt Dep. 126:1-4)

> **Response: Disputed Schmitt only knew of the ice after the fall.**

17.     Tonia Ackerman testified that between 2 and 2:30 p.m. on February 13, 2016 she parked in the subject lot to attend an event at the CenturyLink Center and was walking toward that building when the fall occurred.  (Tonia Ackerman Dep. 87:15-23)  The parking lot attendant whom she paid did not tell her where to park. (Ackerman Dep. 89:20-22)  She parked in Stall 152.  (Ackerman Dep. 94:14-15, 115:9-15)

9

**Response:  Undisputed.**

18.     On the way to Omaha for the event, she encountered no precipitation of any kind, though it was "very cold."  (Ackerman Dep. 89:23-9)

**Response:  Undisputed that Mrs. Ackerman testified as such.**

19.     In the areas where she looked coming into the parking lot and where she parked, she saw no snow or ice on the ground and it looked like normal pavement. (Ackerman Dep. 90:21-91:10)

**Response:  Undisputed.**

20.     The spot where she fell was in Stall 153, roughly one stall away from the one where she had parked.  (Ackerman Dep. 96:4-21, 115:16-18)  She got out of her car, went to the back of her car, turned right, and started to walk toward the exit.  (Ackerman Dep. 116:6-20)

**Response:  Undisputed.**

21.     Mrs. Ackerman testified that she saw no ice on the ground before she fell. (Ackerman Dep. 116:24-117:1, 120:2-6)  She called it "black ice" in her Complaint and explained that she meant "something that you can't see." (Ackerman Dep.120:7-11)

> **Response:  Undisputed as to Mrs. Ackerman's testimony and explanation of black ice.  Defendant and Defendant's expert admit this is black ice.  Schmitt Depo at 94:22-95:6; Depo Exhibit 5; Depo Exhibit 6; Swenson Depo at 44:21-23.**

22.     She admitted that she did not know how the ice on which she slipped got there, and also admitted she has "no idea" if it came from somebody dumping something on the ground, if it was left behind from a snow and ice removal

10

operation of the parking lot, or if it dripped off of a tailpipe of a car that was parked there.  (Ackerman Dep. 120:20-121:7)

**Response:  Undisputed.  However, no response is required as these are not a material facts.  A material fact is one "that might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).**

23.    She also could not identify the dark spot on Dep. Ex. 5 left and above the marking "153" as the patch of ice she slipped on, and though the dark area in the photograph "somewhat looks like just a darker surface, kind of like an oil staining-type spot," but said that was the general area where she fell.  (Ackerman Dep. 124:16-24)

**Response:  Disputed as to facts and characterization.  Mrs. Ackerman testified that the ice spot shown to her was the in the area she fell in. See Tonia Ackerman Depo at 124:20-24.**

24.    She testified that (excluding anything learned through attorney-client communications) she is not aware of any witness or document or evidence that suggests anybody with U-Park had prior knowledge of the patch of ice where she fell.  (Ackerman Dep. 122:3-22, 133:18-134:8, 135:16-25)

**Response:  Undisputed.**

25.    Mrs. Ackerman confirmed as correct the statement that "you don't have any evidence, any witnesses, or belief that [U-Park] or its representative contributed to creation of the defect you fell on."  (Ackerman Dep. 132:7-14) Because of an objection about attorney-client communications, the question was rephrased:  "Other than an expert witness, are you aware of any witness, any information, any evidence whatsoever that supports a conclusion that my client

contributed to creation of the defect that caused your fall?" (Ackerman Dep. 132:24-135:2) Her answer was "no." (Ackerman Dep. 135:3)

> **Response:   Undisputed that Mrs. Ackerman testified as such. Disputed as to Defendant's creation of the same condition.  Schmitt testified that an underground electric cable was placed underneath the very area that this bird bath formed within.  *See* Schmitt Depo at 74:2-13, 75:14-24.  Moreover, Schmitt was intimately aware of this area as he marked it multiple times.  *See* Schmitt Depo at 75:19-24, 75:25-76:22, 79:21-25, 80:1-17.**

26.    Mrs. Ackerman is the only witness to her fall. (Ackerman Dep. 135:12-15)

> **Response:  Undisputed.**

27.    Plaintiffs' expert witness Philip Wayne testified that the plaintiffs' attorney identified to him the location of Mrs. Ackerman's fall and that the extent of the testing he performed at the parking lot in this case was to roll a volleyball and observe asphalt stain patterns to identify water flows on March 8, 2018.  (Wayne Dep. 44:3-45:24) He also observed water flow following rain at a later time.  (Wayne Dep. 48:18-49:12)

> **Response:  Undisputed.**

28.    Following the rain during his second visit in 2018, Wayne saw water pooling in what he described as birdbaths in the general area where the Mrs. Ackerman fell.  (Wayne Dep. 50:1-13)  He said there was sitting water in the spot where plaintiff's attorney had designated as the area of the fall.  (Wayne Dep. 52:13-16)

> **Response:  Undisputed.**

29.    Wayne took 15 photographs on a third site visit, on May 17, 2018. (Wayne Dep. 56:13-16)  However, those photos were taken to show the general condition of the lot and none was taken of the actual area where plaintiffs alleges Mrs. Ackerman fell. (Wayne Dep. 59:6-60:19, 61:16-25)

**Response:  Undisputed.**

30.    Wayne said a "birdbath" is any depression where water is held. (Wayne Dep. 49:17-22)  In his report, he said common causes are car tires resting atop the asphalt during high temperatures and poor subsoil preparation.  (Wayne Dep. Ex. 28, p. 5)

**Response:  Undisputed.**

31.    Wayne's report recites background circumstances about the plaintiffs' claim, including that "she traveled approximately one car length, slipped on a patch of black ice in a saucer like depression in the asphalt referred to as a 'birdbath' resulting in injury." (Wayne Dep. Ex. 28, p. 3)  Wayne was asked whether he agreed with "the premise that when it's black ice, it's not visible to the naked eye," and answered, "Correct."  (Wayne Dep. 105:12-15)

> **Response:  Disputed as to whether a competent lot operator and land owner should be aware of possibility of conditions, particularly when defects exist in lot surface.  See Wayne Depo at 96:22- 97:1 (Schmitt, as operator, should know where bird baths are located).**

32.    Wayne's report states that a photograph at parking space #153 (apparently referring to Dep. Ex. 5) showed "varying colorations of the asphalt surface" that "indicate water flow from melting ice along the fence line toward the general direction of the incident.  As well, there is water flow to the incident site

13

from rear car bumpers. From the asphalt discoloration observed, this condition existed long before the event." (Wayne Dep. Ex. 28, p. 5) This is the most specific thing Wayne said in his report about his observations about the characteristics of the particular location of the fall.

**Response:   Undisputed as to report contents.   Disputed as to characterization.**

33.     Wayne's report referred to the Weather Underground climatological database for February 13, 2016 as stating that the mean temperature for the day was 15.0 degrees and the temperature at the approximate time of the event was 17.1 degrees. (Wayne Dep. Ex. 28, p. 6)  In testimony he agreed that the climate data he reviewed shows no precipitation in this area for six days before the fall occurred.  (Wayne Dep. 89:25-90:4)

**Response: Undisputed.**

34.     Wayne's report summarized from Schmitt's deposition that Schmitt "[c]laims physical inspection are made [*sic*] once a day in the morning." (Wayne Dep. Ex. 28, p. 9 (citing Schmitt Dep. p. 105))

**Response:   Whether Mr. Wayne's report accurately summarized Schmitt's deposition testimony as to his "typical" routine is not a material fact and does not inform as to whether Schmitt's duty fell below the standard of care.  Noteworthy, Schmitt did not testify that he inspected the lot on the date of Mrs. Ackerman's injuries.  *See* Schmitt Depo 68:10-14 (*Q. That's your typical routine. Can you tell us here sitting today under oath that you actually drove through the lot to check out the lot before you set up taking money? A. I cannot specifically say that.*)**

35.     Wayne's report, in a section purporting to state "defendant Schmitt admissions in testimony on May 17, 2018" (the date of his deposition), includes the

following entry: "Pg. 124, 125:  Existence of a patch of ice.  Was not aware that it was there.  The indentions in the asphalt from 2 directions to that spot is where the water came from and had been so for quite some time."  (Wayne Dep. Ex. 28, p. 9) However, Schmitt's actual testimony on the cited pages of his deposition supports only Wayne's statement that Schmitt had testified that he was not aware that the patch of ice was there.  (Schmitt Dep. 124:1-125:25)  Nothing in Schmitt's testimony on those pages touches on indentions in the asphalt, or direction of water flow, or the source of water, or the duration of anything.  Also, nothing in the rest of Schmitt's deposition testimony states what Wayne says Schmitt said on those points.  Wayne admitted in testimony that the sentence in his report about indentions and water direction was his own thoughts and not anything Schmitt said.  (Wayne Dep. 117:16-118:12)  He also clarified that he was not saying the ice had been there for quite some time, because he admitted that he didn't know how long it was there.  (Wayne Dep. 118:13-17)

> **Response:  Undisputed that Mr. Wayne testified that the portion, "The indentions in the asphalt from 2 directions to that spot is where the water came from and had been so for quite some time," was his own opinion.  Disputed as to characterization.**

36.     Wayne's report includes numbered conclusions shown in italics, followed by comments and quotation of testimony.  (Wayne Dep. Ex. 28, pp. 9-11)

> **Response:  No response is required as these are not a material facts.  A material fact is one "that might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).**

37.     The first conclusion in Wayne's report is: "That the defendant either contributed to creation of the defect, knew of the condition, or by the exercise of reasonable care, would have discovered the condition." (Wayne Dep. Ex. 28, p. 9) However, the discussion and testimony following this conclusion all deal with the general need to repair asphalt and the lack of certain procedures for preventative maintenance, not any details about how the ice came to be in the location of the fall or what the evidence said about the defendant's actual knowledge. (Wayne Dep. Ex. 28, pp. 9-10)   In testimony, Wayne agreed that Schmitt never testified that he was aware of the ice spot before hearing about the fall, and instead testified that he did not know it was there. (Wayne Dep. 94:14-23) Wayne testified that he is aware of no other witness to refute Schmitt's testimony about his knowledge. (Wayne Dep. 95:7-10)

**Response:  Disputed as to characterization.**

38.     The second conclusion in Wayne's report is:  "That the defendant should have realized that the condition involved an unreasonable risk of harm to lawful entrants on the premises."  (Wayne Dep. Ex. 28, p. 10)   However, the following discussion and testimony all deal with the broader condition of the lot, such as a pothole needing to be fixed in 2018, a few spots of broken or loose asphalt, and the potential for a birdbath to fill up with water and freeze, not with circumstances involving the particular location of the fall on February 13, 2016. (Wayne Dep. Ex. 28, p. 10)

16

**Response:  Disputed as to characterization.  Undisputed that Mr. Wayne opined that U-Park failed to realize the condition presented an unreasonable risk of harm to patrons.**

39.     The third conclusion in Wayne's report is that the defendant should have expected a lawful entrant to fail to discover the danger or fail to protect against it.  (Wayne Dep. Ex. 28, p. 11)  This element is not at issue in the pending summary judgment motion.

**Response:  Disputed that failure to discover is not an element at issue in the pending summary judgment motion.  *See Edwards v. Hy–Vee, Inc.*, 294 Neb. 237, 240, 883 N.W.2d 40, 43 (2016) (listing elements of premise liability and stating as an element "that the owner or occupier should have expected that the visitor either would not discover or realize the danger or would fail to protect himself or herself against the danger").  Undisputed as to the content of Mr. Wayne's report.**

40.     The fourth conclusion in Wayne's report is:  "That the defendant failed to use reasonable care to protect lawful entrants against the danger."  (Wayne Dep. Ex., p. 11)  However, the following discussion and evidence deals initially with the lack of formal procedures for overall maintenance of the entire lot.  Wayne's report states: "Pg. 105:  Lot is checked every day by Defendant to make sure people paid. [No mention of looking g [sic] for problem to repair.]"  (Wayne Dep. Ex. 28, p. 11) However, Wayne ignored Schmitt's testimony from that very same page and the one before, where Schmitt testified that he was at the subject parking lot "just about every day," and would "usually walk the whole lot, checking for – checking the cars, make sure that people paid and then the condition of the parking lot."  (Schmitt Dep. 104:4-11)  He would usually make a physical inspection once on a normal day in the morning when he arrived.  (Schmitt Dep. 105:1-8)  When asked about this

part of his report, Wayne conceded that Schmitt did testify that during his daily walk-arounds he was looking for problems, and all Wayne was saying in his report was that Schmitt hadn't said that on page 105 in particular.  (Wayne Dep. 120:2-121:8)

**Response:  Disputed that Schmitt checked the parking lot on the date of Mrs. Ackerman's fall.  Moreover, Defendant cannot say the lot was, in fact, checked on the date of Mrs. Ackerman's fall.  *See* Schmitt Depo. 68:10-14 (*Q. That's your typical routine. Can you tell us here sitting today under oath that you actually drove through the lot to check out the lot before you set up taking money? A. I cannot specifically say that.*)  Whether he typically checks the lot is not a material fact and requires no response.  A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).**

**Undisputed that Mr. Wayne's report opines that U-Park and Schmitt's actions fell below the standard of care.**

41.     Wayne's report also states in its discussion purporting to support his fourth conclusion: "Pg. 124, 125:  Existence of a patch of ice.  Was not aware that it was there.  The indentions in the asphalt from 2 directions to that spot is where the water came from and had been so for quite some time."  (Wayne Dep. Ex. 28, p. 11) This is exactly the same language from page 9 of his report discussed above, which Wayne admits constituted his own thoughts, not anything Schmitt said.

**Response:  Plaintiff has already responded to the above at ¶ 35.**

42.     In a section of Wayne's report about foreseeability, he stated:  "While Mr. Schmitt freely admits to his responsibility to inspect the property to anticipate repair issues, either the inspection never occurred or only the absolute minimum of effort corrective action was taken."  (Wayne Dep. Ex. 28, p. 12)   However, Wayne

ignores testimony by Schmitt that he daily inspected the condition of the property and inspected it the morning of the accident. (Schmitt Dep. 68:1-9, 72:20-73:3, 90:14-17, 104:4-11, 105:1-8)   Other than making statements about a lack of inspection, Wayne cites to no evidence contradicting Schmitt's testimony that he did inspect the condition of the lot on the morning of the accident.   He instead agreed that Schmitt did testify he inspected the lot the morning of the fall.   (Wayne Dep. 116:19-22)

> **Response:   Undisputed that Mr. Wayne's report opines that Mr. Schmitt had responsibility to inspect the lot and either did not do so or did so only at the absolute minimum effort.**
>
> **Disputed that Schmitt checked the parking lot on the date of Mrs. Ackerman's fall.  Moreover, Defendant cannot say the lot was, in fact, checked on the date of Mrs. Ackerman's fall.   *See* Schmitt Depo. 68:10-14 (*Q. That's your typical routine. Can you tell us here sitting today under oath that you actually drove through the lot to check out the lot before you set up taking money? A. I cannot specifically say that.*)  Whether he typically checks the lot is not a material fact and requires no response.  A material fact is one "that might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   No citations provided by Defendant attest that Schmitt checked the lot on the date of Mrs. Ackerman's injuries. As illustrated below, the citations provided by Defendant do not indicate that Schmitt checked the lot of the date of Mrs. Ackerman's injuries.**
>
> **The citations provided by Defendant are as follows:**
> * **68:1-9**
>   * **"Then I just sit in my car and – I kind of drive through and make sure everything is okay, and then just sit in my car and wait for people to come in.**
>   * **Q: What do you mean, drive through, kind of make sure everything is okay?**
>   * **A: That the lot was in, you know, good shape.  Not much – it was pretty clear that day**
> * **72:20-73:3**
>   * **Q. Okay.  Tell me about what the weather was like that day.**

- ○ A. That was a long time ago.  But anyway, it was cold.
- ○ Q. It was cold?
- ○ A. It was cold.
- ○ Q. Wintertime, it's cold.
- ○ A. Yes. Otherwise, there was no snow or anything.  I know that.  So –
- **90:14-17**
  - ○ A. No, I did not.  Because I think the parking lot was – from the picture, you can see it was – it was real clear, I think.  The parking lot was real clean.
- **104:4-11**
  - ○ A. I'm down at the parking lot just – when I was running it, I was down there just about every day.
  - ○ Q. Right.
  - ○ A. I usually walk the whole lot, checking for – checking the cars, make sure that people paid, and then the condition of the parking lot.
- **105:1-8**
  - ○ Q. And is it your claim that you're making a physical inspection of Lot 13 more than once a day under those circumstances?
  - ○ A. On a normal Day? I would think usually just once.
  - ○ Q. All right.  Like in the morning when you get there?
  - ○ A. Yes.

43.    Wayne testified that all of the opinions that he intends to offer in this

case are contained in his report, Dep. Ex. 28.  (Wayne Dep. 79:18-21)

**Response:  No response is required as this is not a material fact.  A material fact is one "that might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).**

44.    Wayne made no observations of the subject parking lot after the Mrs.

Ackerman's fall until he was retained in March 2018, more than two years after her

fall.  (Wayne Dep. 81:2-10)  Other than Dep. Exs. 5 and 6, he has not viewed any

photographic evidence of the condition of the parking lot as it was on the day of the

fall.  (Wayne Dep. 81:11-16)  Other than looking at those two photographs, Wayne

has no idea from his own personal knowledge and observation what the overall condition of the parking lot was on the date of the fall.  (Wayne Dep. 81:20-82:3)

> **Response:  Undisputed that Mr. Wayne reviewed these photographs. Disputed as to Mr. Wayne's knowledge and ability to determine the likely condition of the lot.  Mr. Wayne testified that asphalt issues do not occur "overnight" and these issues would have existed for a long period of time.  *See* Wayne Depo at 85:14-22.**

45.    Wayne conceded that on Dep. Ex. 5, the photo taken by Schmitt after the accident, the only snow depicted is located in the southeast portion of the parking lot.  (Wayne Dep. 87:16-20; Schmitt Dep. Ex. 5)  He conceded that there is no evidence depicted in Dep. Ex. 5 showing surface ice running from the pile of snow on the southeast corner to the spot where Mrs. Ackerman fell.  (Wayne Dep. 89:1-12; Schmitt Dep. Ex. 5)  Wayne said there is discoloration on the surface of the lot in Dep. Ex. 5 which suggests there would have been thaw, water running, and refreezing of it over time. (Wayne Dep. 89:19-24; Schmitt Dep. Ex. 5)  If there was ice that would lead from the snow pile to the area where Mrs. Ackerman fell to suggest that there was some thawing and refreezing, that is not shown in the photograph.  (Wayne Dep. 90:5-9; Schmitt Dep. Ex. 5)

> **Response:  Undisputed that Mr. Wayne testified there was no surface ice running from the snow pile and that Mr. Wayne correctly identified the snow pile location.   Undisputed that Mr. Wayne identified signs on the pavement to indicate thaw, water flow, and freezing over time.  Disputed as to characterization.**

46.    Wayne testified that he has no way of knowing from reviewing any of the documentation or testimony how long that ice spot where plaintiffs alleges Mrs. Ackerman fell existed before her fall.  (Wayne Dep. 107:5-9)

**Response:  Undisputed that Mr. Wayne testified as such.  Disputed whether Wayne's knowledge of length of time of ice is material to Defendant's duty to remedy or warn customers of a condition.**

47.    Wayne stated some possibilities for what might have created the black ice, as he described it, in Dep. Exs. 5 and 6, but admitted that he does not know what caused it and added that there were "several possible reasons."  (Wayne Dep. 111:13-18)  He admitted there had been no precipitation in the area for six days, but said there were other reasons to have a water spot there:  "[T]here are ruts all along here from the tires and from the leakage, from the exhaust, from draining from tires, draining from bumpers they have gone through slush.  They have hit pockets of ice and snow that they picked up along the road, and as they sit there, it drains from a hot engine." (Wayne Dep. 97:6-21)  He testified that "this water could be coming from the car or any other reason."  (Wayne Dep. 118:22-23)   "You have accumulated ice under the bumpers, around the bumpers, on the tires.  You've been in Nebraska long enough to know that when you drive, your car gets full of slush.  It hangs off the back of your mud flaps.  All of these accumulations are dripping and created these kinds of birdbaths incidental of the fact that there is a snow or precipitation."  (Wayne Dep. 98:1-7)

**Response:  No response is required as these are not a material facts. A material fact is one "that might affect the outcome of the suit under the governing law."** ***Anderson v. Liberty Lobby, Inc.*****, 477 U.S. 242, 248 (1986).  Undisputed that Mr. Wayne testified as such.**

48.    As is apparent throughout his report and testimony, Wayne's theory is that the overall maintenance of the parking lot was poor, and that "all rolled into a lack of maintenance on several levels."  (Wayne Dep. 61:7-13; Wayne Dep. Ex. 28)

He stated his view that because Schmitt was tending the lot for several years, he should know where the birdbaths are.  (Wayne Dep. 119:18:23)

> **Response:  Undisputed that Mr. Wayne testified that U-Park and Schmitt failed their duty of care and that Schmitt should have known, as the lot operator who purportedly "walks" or "drives through" the lot frequently checking for issues, where the bird baths and other asphalt issues are located.**

49.     In testimony Wayne agreed that if there was alligatoring or erosion or cracking or birdbathing in other locations in the lot, all of those things going on had nothing to do with the fall in Stall 153.  (Wayne Dep. 62:17-63:1; Wayne Dep. Ex. 28, pp. 5, 13)

> **Response:  Disputed as to characterization.  Mr. Wayne testified that these issues went to the overall question as to maintenance of the lot in general.  *See* Wayne Depo at 61:14-20.**

## B.     Plaintiff's Additional Statement of Undisputed Material Facts

1.     The record is devoid of any evidence that Schmitt or any other U-Park agent inspected the lot on the date of Mrs. Ackerman's injuries.  *See* Schmitt Depo. 68:10-14 (Q. That's your typical routine. Can you tell us here sitting today under oath that you actually drove through the lot to check out the lot before you set up taking money? A. I cannot specifically say that.)

2.     No agent of U-Park, including Schmitt, discovered the ice spot prior to Mrs. Ackerman's fall.  *See* Schmitt Depo at 125:13-18.

3.     Schmitt's main focus, when he does actually check the lot, is to determine if people have paid.  *See* Schmitt Depo at 126:7-11 (Q. And when you say that you go there and you walk around the lot, you go there to walk around to make

sure people have paid.  That's your main focus, isn't it? A. Right.); Schmitt Depo at

104:8-11 (A. I usually walk the whole lot, checking for – checking the cars, make

sure that people paid, and *then* the condition of the parking lot) (emphasis added).

4.    Schmitt admits to paying closer attention to the lot and knowing the

lot better than a one-time parker in the lot.  *See* Schmitt Depo at 95:19-97:1.

5.    U-Park, through agent Schmitt admits, in regard to lot inspection and

snow removal, they have:

    a.  No logs of inspection/snow removal.  Schmitt Depo at 105:9-12.

    b.  No membership in snow removal associations.   Schmitt Depo at
       105:13-22.

    c.  No professional training in snow removal.   Schmitt Depo at 105:23-
       106:9.

6.    U-Park has no annual maintenance.  *See* Schmitt Depo at 48:4-5.

7.    U-Park has no protocols for inspecting or correcting existing asphalt

deficiencies.  *See* Schmitt Depo at 46:22-47:2.

8.    U-Park has no preventative maintenance plan to ensure the asphalt is

in good condition.  *See* Schmitt Depo at 47:4-9.

9.    The weather, on the date of Mrs. Ackerman's injuries, was cold and did

not rise above freezing.  Schmitt Depo at 72:20-23; Tonia Ackerman Depo at 90:4-6;

Wayne Dep. Ex. 28, p. 6; Schmitt Depo Exhibit 13.

10.    A bird bath depression existed within the natural drainage path in Lot

13 within spot 153.  *See* Wayne Depo at See Wayne Depo at 49:17-25 (testifying that

the spot where Mrs. Ackerman fell was a bird bath depression); Wayne Depo at 40:9 – 41:14 (testifying as to bird bath defects in asphalt parking lots); Wayne Depo at 54:2-16 (testifying as to water drainage and the location of Mrs. Ackerman's fall); Wayne Depo at 44:12-24 (identifying stains and path of water flows); Schmitt Depo at 57:1-58:15 (noting the path of water drainage).

11. The bird bath did not form overnight and would have existed for years. *See* Wayne Depo at 85:15-17 (bird baths take years to develop).

12. Schmitt has personally repaired the asphalt on the lot. *See* Schmitt Depo at 38:19-21 ("I did a few -- filled a few holes there. And that's -- I think that's all that's been done."); Schmitt Depo at 40:1-3 ("I believe we had like three holes that required filling. One I filled with cement, and two with blacktop.")

13. Schmitt and U-Park failed to remedy this bird bath depression in the asphalt prior to Mrs. Ackerman's injuries. *See* Schmitt Depo at 38:19-21 ("I did a few -- filled a few holes there. And that's -- I think that's all that's been done."); Schmitt Depo at 40:1-3 ("I believe we had like three holes that required filling. One I filled with cement, and two with blacktop.")

14. U-Park and Schmitt had an underground cable installed that ran perpendicular and through spot 153. *See* Schmitt Depo at 74:2-13, 75:14-24.

15. Schmitt marked this cable area periodically. *See* Schmitt Depo at 75:19-24, 75:25-76:22, 79:21-25, 80:1-17.

16.     Schmitt, as operator, should have been familiar with this lot defect and should have known of its location.   *See* Wayne Depo at 96:22- 97:1 (Schmitt, as operator, should know where bird baths are located).

17.     Schmitt, as lot operator, had a duty to inspect the lot during the winter months to ensure the lot was free from ice.   *See* Wayne Depo at 108:11-16 (it is reasonable for a lot operator to inspect the lot days after a weather event; Wayne Depo at 109:2-6 (Lot should be inspected daily during the winter months).

18.     After parking her vehicle, Mrs. Ackerman exited, proceeded to the nearest walk-way and fell on a patch of black ice one stall from where she parked. *See* Tonia Ackerman Depo at 97:24-98:1, 94:14-15, 96:16-21, 116:6-23; *see also* Depo Exhibit 5 (depicting the nearest walkway).

19.     Water, in the form of black ice, was present in the bird bath depression causing Mrs. Ackerman's fall.   *See* Wayne depo at 99:17-18 ("What we do know if there is water here); Depo Exhibit 5, Depo Exhibit 6; Wayne Depo at 84:13-18; Swenson Depo at 44:21-23.

20.     This area was large enough for Mrs. Ackerman to slip on.   *See* Swenson Depo at 44:24-45:7; Depo Exhibit 5; Depo Exhibit 6.

21.     Snow was pushed against the southeast corner of the lot and would allow for ice/snow to melt and drain towards the bird bath depression in sport 153. *See* Wayne Depo at 88:8-14; Schmitt Depo at 94:22-95:8.

22.     Schmitt and U-Park failed to remedy the black ice present in the bird bath prior to Mrs. Ackerman's injuries.  Schmitt put ice melt down only *after* Mrs. Ackerman's injuries.  *See* Schmitt Depo at 73:4-9; Schmitt Depo at 125:13-18.

23.     Expert testimony indicates that a bird bath depression can be caused from underground construction.  *See* Wayne Depo at 40:19-40:5.

24.     Expert testimony indicates the lot was in severe disrepair and numerous issues present in 2018 would have exists for years, illustrating a general lack of maintenance of overall lack of the exercise of reasonable care that would have existed at the time of Mrs. Ackerman's injuries.  *See* Wayne Depo at 59:16-23, 61:7-20; *see also* Depo Exhibit 27 (18 photographs).

25.     Defendant's expert, Jeremy Swenson, indicates snow was piled in the southeast corner and provides a diagram that the natural water runoff would go towards the bird bath depression, allowing pooling of water.  Moreover, Swenson's report states, "I do agree that there is a water drainage path that runs towards and through this area" (referring to the bird bath depression).  *See* Swenson Report at 12, 13, and 14.

26.     Photographs and testimony indicate the lot had severe alligatoring, loose asphalt and pot holes, illustrating Defendant failed to maintain the lot anywhere near the required exercise of reasonable care.  *See* Wayne Depo at 38:9-12, 59:16-23, 61:7-20, 85:14-22 (asphalt damage takes years); Depo Exhibit 27 (Photographs).

## IV.   ARGUMENT

The defendant contends that because Joseph Schmitt, acting on behalf of U-Park did not (1) create the ice spot and (2) did not see the ice spot prior to Mrs. Ackerman's fall that he cannot be held liable, despite his responsibility to ensure the exercise of reasonable care in the maintenance of the premises.  This is not the law.  Instead, a defendant, in a negligence case, may be held liable when they knew or "should have known" through the exercise of reasonable care of the dangerous condition, as is the case here.   The Court should deny Defendant's motion for summary judgment as there are material facts in dispute.

### A.      Relevant Nebraska Law

The Nebraska Supreme Court has stated,

> In premises liability cases, an owner or occupier is subject to liability for injury to a lawful visitor resulting from a condition on the owner or occupier's premises if the lawful visitor proves (1) that the owner or occupier either contributed to creation of the defect, knew of the condition, or by exercise of reasonable care would have discovered the condition; (2) that the owner or occupier should have realized the condition involved an unreasonable risk of harm to the lawful visitor; (3) that the owner or occupier should have expected that the visitor either would not discover or realize the danger or would fail to protect himself or herself against the danger; (4) that the owner or occupier failed to use reasonable care to protect the visitor against the danger; and (5) that the condition was a proximate cause of damage to the visitor.

*Hodson v. Taylor*, 860 N.W.2d 162, 174 (2015).

### B.      Defendant Knew or should have Known of this Defective Condition in the Asphalt and the Resultant Black Ice

In order to prove premises liability, Plaintiffs may show that the Defendant knew or should have known, through the exercise of reasonable care, of the defective condition that caused injury.  Here, Plaintiff alleges that a bird bath defect

28

in the asphalt existed and allowed for water runoff to pool and freeze into black ice. Plaintiff alleges that Defendant knew or should have known about (1) the bird bath defect in the lot and (2) the resultant black ice that would not have existed but for this bird bath defect.  Instead, Defendant attempts to minimize theories of liability contending that Defendant can *only* be liable if there was evidence that Schmitt discovered the ice spot prior to Mrs. Ackerman's fall.  Defendant misstates that law as to premises liability.  Nebraska law does not require *actual* discovery prior to injury, but instead allows liability when the condition would be discovered by the exercise of reasonable care.  *See Hodson*, 860 N.W.2d at 174.

Plaintiffs do not contend that any evidence illustrates Schmitt saw the black ice prior to Mrs. Ackerman's fall and injuries.  Instead, Plaintiffs allege that Defendant knew or should have known of the bird bath defect and resultant black ice.

Defendant bases the entirety of argument on *Edwards v. Hy-Vee, Inc.*, 883 N.W.2d 40 (2016).  Defendant contends that *Edwards* "shows the way."  *Edwards* involves a premises liability claim relating to an invitee's slip and fall on a slice of watermelon that was lying on Hy-Vee's floor.  *Edwards* does not relate in any way to ice or open air parking lots.  Further, *Edwards* does not bar a claim for premises liability if the plaintiff alleges the defendant "should have known" of the condition or "would have discovered" the defective condition by the exercise of reasonable care.  *See Edwards*, 883 N.W.2d at 240, 243.  Instead, Edwards held that the case presented "no evidence or reasonable inference that Hy-Vee knew or should have

29

known of the watermelon on the floor" and granted summary judgment for Hy-Vee. *Id*. at 243. *Edwards* is predicated on the length of time that passed between the creation of the hazardous condition and plaintiff's injury. Accordingly, *Edwards* is not analogous to the present case.

### 1.   Defendant knew or should have known of the bird bath defect

In the case at hand, a reasonable inference supports a jury determination that Defendant knew or should have known of the bird bath defect and/or the resultant black ice. Summary judgment must be precluded based on this reasonable inference.

As illustrated above, Defendant routinely marked this area, had an underground electric cable installed, and purports to have made frequent inspections of the lot and spent time at the lot "almost daily." This evidence would allow a reasonable jury to infer that Defendant knew or should have known of the existence of the bird bath defect and allowed water to pool within the natural water runoff of Lot 13. *See* Plaintiffs' SUMF ¶¶ 21, 25, 25. Defendant's own expert admits the bird bath existed within the water runoff and where snow melt would occur. *See* Plaintiffs' SUMF ¶ 25. The record contains evidence that Defendant allowed the lot to remain in a state of disrepair with severe alligatoring, bird baths, pot holes, and loose asphalt. *See* Plaintiffs' SUMF ¶¶ 24, 26. The record also contains evidence that Schmitt knew that bird baths allowed for water to pool and the resultant water could form into ice. *See* Def's SUMF ¶ 9 and Plaintiffs'

Response.  From this evidence, a jury may reasonably infer that Defendant knew this bird bath required repair as it could result in a dangerous condition to invitees during the winter months.  A jury may also reasonably infer, based on Defendant's admitted lack of maintenance plan and procedure that they failed to exercise reasonable care in the maintenance of the parking lot.  *See* Plaintiffs' SUMF ¶ 5, 6, 8.  This reasonable inference precludes summary judgment.

> **2.    Defendant knew or should have known of the resultant black ice**

Defendant contends, incorrectly, that liability may only attach if Schmitt discovered the ice prior to Mrs. Ackerman's fall and failed to remedy this condition.  The case law does not support this proposition.  Nor do the facts at hand.  Defendant would have discovered this condition by the exercise of reasonable care and failed to do so.  A material dispute exists as to this failure.  The Court should deny Defendant's motion for summary judgment.

The bird bath depression existed for a long period of time and likely existed for years prior to Mrs. Ackerman's injuries.  *See* Plaintiffs' SUMF ¶ 11.  A jury may infer that Defendant would be aware of water pooling and forming into ice periodically within this bird bath depression based on this testimony.  A jury may also reasonably infer, based on Schmitt's allegation that he walked the lot "just about every day" that he would have discovered this periodic issue and would be on notice of the associated dangers.  As such, summary judgment is precluded.

A jury may infer, based on the size of this black ice and the temperature at the time of Mrs. Ackerman's injuries and that day, that this condition existed for a

long period of time and Defendant knew or by the exercise of reasonable care would have discovered the condition. Ice, by its very nature, cannot form in an instant and a jury may infer from the size of the ice patch and fact that it is ice that it existed for a sufficient period of time before a fall and would allow discovery by a defendant. Here, the description of the ice patch was evidence that a jury could use to infer how long it existed prior to Maria's fall. *See Starks v. Wal-Mart Stores, Inc.*, No. A-17-801, 2018 WL 3456008, at *6 (Neb. Ct. App. July 17, 2018) (unpublished decision) ("An ice patch on a sidewalk, like a hole in a soccer field, cannot form in an instant. Despite Maria's statement that she did not know how long the ice patch had existed before her fall, the description of the ice patch supports a reasonable inference that it existed long enough for Wal-Mart to discover and remedy it.") Noteworthy, the plaintiff in *Stark* did not prove any evidence as to the length of time the ice spot existed and had "no way of knowing" how long the ice patch existed. *Id*. at 5. In addition, the record illustrated Stark did not provide evidence as to Wal-Mart's actual knowledge of the ice patch. *Id*. at 2. Nevertheless, due to the inherent nature of the existence of ice and the size of the ice patch, the court determined that a reasonable jury could infer it existed for a sufficient period of time to allow Wal-Mart to discover the defect by exercising reasonable care. *Id*. at 6.

The same analysis is appropriate in the case at hand. As stated above, a jury could infer that Defendant, by exercising reasonable care, could have discovered the bird bath defect that allowed water to pool and form into ice periodically. A reasonable jury could also infer, based on the size of this ice patch, the temperature

remaining in the teens, and the lack of precipitation, that this ice patch existed long enough for Defendant to have discovered it by exercising reasonable care. *See* Exhibit 5 (illustrating the size of the spot and visibility of the same), *see also* Plaintiffs' SUMF ¶¶ 10, 11, 16, 17, 19, 20, 21.  A reasonable jury could also infer that the location of snow allowed for periodic melt and runoff to this bird bath resulting in an ice patch. *See* Plaintiffs' SUMF ¶¶ 21, 25.  Defendant's own expert attests that water drainage runs over and through this path.  See Plaintiffs' SUMF ¶ 25 ("I do agree that there is a water drainage path that runs towards and through this area") (photographs of drainage over area).  Moreover, a jury could infer that the failure of Defendant to inspect the lot on the date of Mrs. Ackerman's injuries allows a reasonable inference that Defendant failed to exercise reasonable care and failed to discover the ice spot due to this failure. *See* Plaintiffs' SUMF ¶ 1.  As such, the Court should deny Defendant's motion for summary judgment.

## C.     Defendant Contributed to the Creation of Defective Condition

There is a material factual dispute as to creation of the asphalt defect at issue in this case.  As such, the Court should deny Defendant's motion for summary judgment.

Defendant alleges that U-Park and Schmitt did not create the asphalt defect at issue in this case.  This is disputed.  Defendant incorrectly alleges that the only "condition" contested and at issue is the black ice causing Mrs. Ackerman's fall.  Contrary to this assertion, Plaintiffs also allege that water pooled and formed into black ice as a result of a defective condition in the parking lot asphalt, namely a

bird bath depression within the natural water runoff path on the parking lot. Had this bird bath depression not existed, water could not pool and could not form into black ice on this precise spot.

Defendant, as possessor of the land, is responsible for any defective condition on the property and resulting harm to invitees. *See Downey v. W. Cmty. Coll. Area*, 808 N.W.2d 839, 847 (2012). Defendant's contention that they were not "responsible" for asphalt repair is immaterial as they admit to being possessor of the land and were therefore responsible for any defective condition. Moreover, Schmitt admits to having personally fixed asphalt. *See* Plaintiffs' Response to Def's SUMF ¶ 3; *See also* Plaintiffs' SUMF ¶ 12.

In this instance, Defendant had superior knowledge of the property, alleges an agent frequently "walked" the property for the safety of its customers. Furthermore, Schmitt personally repaired similar defects located on the property in the past. *See* Plaintiffs' SUMF ¶¶ 4, 12; s*ee also* Def's SUMF ¶ 8 (including Plaintiffs' Response to Def's SUMF ¶ 8). Noteworthy, Defendant installed an electrical line beneath the asphalt and had the line tunneled beneath the asphalt. *See* Plaintiffs' SUMF ¶ 14. This particular electric line ran perpendicular to the natural water runoff path and directly through the bird bath defect. *See* Plaintiffs' SUMF ¶¶ 14, 21, 25. Defendant was intimately aware of this area because it periodically marked the location with paint. *See* Plaintiffs' SUMF ¶ 15. In fact, paint from the electric line marking can be seen along the path of the bird bath depression and black ice causing Mrs. Ackerman's fall and resultant injuries. *See*

34

Depo Exhibits 5 and 6 (noting Exhibit 5 depicts the ice spot prior to the application of ice melt; Exhibit 6 clearly shows the ice has melted and allowed water to expand outward).

Expert testimony indicates that bird baths can be caused by defective construction beneath the asphalt. *See* Plaintiffs' SUMF ¶ 23. Because Defendant had this electric line installed and because a bird bath resulted along the path, a reasonable jury could infer that the defective construction, at Defendant's direction, caused the creation of this bird bath depression. *See Tolan*, 572 U.S. at 660 (all reasonable inferences should be draw in favor of the non-moving party). As such, a fact issue exists as to Defendant's creation of this defective condition and Defendant's motion should be denied.

Defendant was intimately aware of the creation of this condition, repeatedly "inspected" the lot, and had this area marked. A reasonable jury could draw from these facts that the condition allowing for water to pool and freeze was created by Defendant and that Defendant knew or should have known of this condition, should have remedied the condition, and failed to do so. This precludes a grant of summary judgment.

**D.    Additional Evidence Allows a Jury to Infer Defendant was Negligent in Parking Lot Maintenance**

In addition to the above listed evidence, the record contains further information a jury may use to infer that Defendant failed to exercise reasonable care.

Here, Defendant admittedly had no annual maintenance, preventative maintenance, or any plan to address defective asphalt conditions. *See* Plaintiffs' SUMF ¶ 7 and 8. Defendant also admits to failing to maintain snow removal/inspection logs, has no membership in snow removal associations, and no professional training in snow removal. *See* Plaintiffs' SUMF ¶ 5. Expert testimony also indicates the lot was in severe disrepair and illustrated Defendant failed to exercise reasonable care in maintaining the lot by allowing asphalt issues to be present for years. *See* Platinffs' SUMF ¶ 24. Expert testimony further indicates the asphalt had severe alligatoring (scale-like cracking), pot holes, and loose asphalt that would have taken years to develop. *See* Plaintiffs' SUMF ¶ 26. Moreover, photographs illustrate the complete lack of maintenance and failure to exercise reasonable care in the maintenance of this lot. *See* Plaintiffs' SUMP ¶ 24, 26. A jury could reasonably infer that Defendant failed to exercise reasonable care in the maintenance of the parking lot and in other areas required to make the parking lot safe for visitors. As such, summary judgment is precluded.

## IV.    CONCLUSION

The Court should deny Defendant's motion for summary judgment. There exist disputed facts as to the creation of the condition and whether Defendant would have discovered the condition by exercising reasonable care. These are material to Plaintiffs' burden of proof. As such, summary judgment is precluded.

WHEREFORE, Plaintiffs respectfully request the Court deny Defendant's motion for summary judgment.

Respectfully submitted,

**Certificate of Service**

The undersigned certifies that the foregoing instrument
was served upon the parties to this action by serving a
copy upon each of the attorneys listed as receiving notice
on January 18, 2019, by E-Mail.

_/s/ Sara Pottebaum_

Copy to:

Michael T. Gibbons
Woodke & Gibbons, P.C., L.L.O.
Historic Inns of Court Building
619 North 90th Street
Omaha, NE 68114
mgibbons@woglaw.com

ATTORNEY FOR DEFENDENT

GREFE & SIDNEY, P.L.C.

By: _/s/ Guy R. Cook_
  Guy R. Cook

  500 E. Court Ave., Ste. 200
  Des Moines, IA  50309
  Phone:  515/245-4300
  Fax: 515/245-4452
  gcook@grefesidney.com

COUNSEL FOR PLAINTIFFS