1              IN THE UNITED STATES DISTRICT COURT

2                       FOR NEBRASKA

3    TONIA ACKERMAN and DENNIS      )
     ACKERMAN,                      )
4                                   )   CASE NO. 8:17-CV-209
                  Plaintiffs,       )
5                                   )   [COPY]
          vs.                       )
6                                   )   DEPOSITION OF
     U-PARK, INC.,                  )
7                                   )   JEREMY E. SWENSON, CSP
                  Defendant.        )
8    _____  )

9         THE DEPOSITION OF JEREMY E. SWENSON, CSP,
     taken before Stephanie J. Cousins, Certified
10   and Registered Professional Reporter,
     commencing at 1:12 p.m., November 13, 2018, at
11   Woodke & Gibbons, 619 North 90th Street, Omaha,
     Nebraska.

12
     APPEARANCES OF COUNSEL:
13
          For the Plaintiffs:
14
                  GUY R. COOK
15                SEAN M. CORPSTEIN
                  Attorneys at Law
16                Grefe & Sidney
                  500 East Court Avenue, Ste. 200
17                Des Moines, Iowa 50309
                  (515) 245-4300
18                gcook@grefesidney.com
                  scorpstein@grefesidney.com
19
          For the Defendant:
20
                  MICHAEL T. GIBBONS
21                Attorney at Law
                  Woodke & Gibbons
22                619 North 90th Street
                  Omaha, Nebraska 68114
23                (402) 391-6000
                  mgibbons@woglaw.com
24

25        Reported by:  Stephanie J. Cousins, R.P.R.

EXHIBIT 5

1                    I N D E X

2     Examination By:                          Page

3        Mr. Cook                               3

4
                          EXHIBITS
5
      Exhibit No.                              Page
6
         26                                     7
7

8

9

10
       Requested Items:
11
            Log of Testimony - Page 4
12          Photograph - Page 24
            Study Materials for Test - Page 34
13

14

15

16

17

18

19

20

21

22

23

24

25

 1                JEREMY E. SWENSON, CSP,

 2        called as a witness, having been first

 3         duly sworn, testified as follows:

 4                DIRECT EXAMINATION

 5    BY MR. COOK:

 6        Q.   State your name for the record,

 7    please.

 8        A.   Jeremy Swenson.

 9        Q.   Sir, my name is Guy Cook.  We're here

10    today for the purposes of taking your

11    deposition.  I represent Tonia and Dennis

12    Ackerman in a case pending in the United States

13    District Court for the District of Nebraska.

14    You've just taken an oath from the court

15    reporter.  She's an Officer of the Court,

16    authorized to administer oaths, you understand,

17    subject to the penalties for perjury should you

18    give false statements here today?

19        A.   Yes.

20        Q.   I know from looking at your materials

21    that you've given many depositions in the past,

22    and so I won't trouble you with what the rules

23    of a deposition are.  You know what they are;

24    right?

25        A.   Yes.

```
 1        Q.    I understand that you've testified in
 2   court one time.  Has that changed?
 3        A.    No.
 4        Q.    Okay.  Have you ever been recognized
 5   or declared an expert in the U.S. District
 6   Court for the District of Nebraska?
 7        A.    No.  Not to my knowledge.
 8        Q.    And tell me how many depositions
 9   you've given since you started the consulting
10   business ten years ago.
11        A.    Around sixteen.
12        Q.    And how many of those have been for
13   the plaintiff and how many for the defense?
14        A.    It's approximately 60 percent
15   plaintiff, 40 percent defense.
16        Q.    Do you still have copies of those
17   transcripts?
18        A.    No.
19        Q.    Do you keep any kind of a log of your
20   testimony?
21        A.    Yes.
22        Q.    Okay.  Have you got that available
23   that you could provide to Mr. Gibbons to
24   provide to me?
25        A.    Yes.
```

1        Q.    I'd ask that you do that.  And through

2    the course of our deposition today, here as a

3    convenience to you and to me also, if I ask for

4    something, we'll ask our court reporter to list

5    that at the beginning of the transcript, so

6    that we can easily find what it is that we've

7    listed as action things we're trying to follow

8    up on.  Okay?

9        A.    Okay.

10       Q.    Do you have any kind of a file that

11   relates to this matter?

12       A.    Yes.

13       Q.    And did you bring that with you today?

14       A.    No.

15       Q.    What's contained in the file?

16       A.    The documents that are listed on the

17   back of my report.  So just case files, some

18   photos, notes.  I think that's it.

19       Q.    When were you retained in this matter?

20       A.    It would have been in the summer.  So

21   it would have been sometime around August --

22   July or August, I believe.

23       Q.    That would be confirmed in your file?

24       A.    Yes.

25       Q.    And as I understand it -- and you

 1   correct me -- you charge different rates for

 2   review as contrasted with testimony; is that

 3   right?

 4        A.   Yes.

 5        Q.   And is it 290 for testimony?

 6        A.   It's 295, yes.

 7        Q.   295 for testimony?

 8        A.   Yes.

 9        Q.   And that would be in a deposition or

10   in court?

11        A.   Yes.

12        Q.   And then it's something less than that

13   for file review or other work?

14        A.   Yes.

15        Q.   And what is that?

16        A.   It's 195.

17        Q.   How many hours do you have in this

18   case up to this point?

19        A.   I don't recall the exact number.  I'd

20   have to look on my billing.

21        Q.   Okay.  What would be your best

22   estimate?

23        A.   Twelve hours.

24        Q.   And some of that would be file review,

25   or most of it would be?

1      A.   Yes.

2      Q.   And the site visit that you did this

3   summer, is that at the 195 rate?

4      A.   Yes.

5      Q.   Have you been paid for these

6   approximate twelve hours?

7      A.   Yes.

8      Q.   Other than perhaps testifying should

9   there be a trial in this case, if the Court

10   permits that, do you intend to have to incur

11   any other work or hours on the case?

12      A.   Not unless more information becomes

13   available.

14           MR. COOK:  This report we will

15   mark as an exhibit that you generated.  And I

16   think our next exhibit is 26.  Does that sound

17   right?

18           MR. GIBBONS:  Sounds right.

19           (Exhibit 26 was marked for

20   identification by the reporter.)

21   BY MR. COOK:

22      Q.   Our court reporter has marked as

23   Exhibit 26 your seventeen-page submission, and

24   you have that in front of you.  Is that right,

25   sir?

 1        A.    Yes.

 2        Q.    So we're going to talk about that

 3   periodically as we have our conversation today.

 4   The report has a date of August 30th.  How many

 5   days before that do you think you were

 6   retained?

 7        A.    I don't recall the exact number, but

 8   it would have been 30 or 60 days, probably,

 9   before that.

10        Q.    And you did conduct an examination of

11   the property on August 16th, at least according

12   to your report; is that correct?

13        A.    Yes.

14        Q.    And can you give us any sense of how

15   many days before that you were retained?

16        A.    I think I already answered that.  It

17   was somewhere in the 30 to 60 days before that,

18   I believe.

19        Q.    Okay.  So how did you first learn

20   about this case?

21        A.    I was contacted by Mike, and --

22        Q.    Mr. Gibbons?

23        A.    Yes.

24        Q.    And what did he tell you?

25        A.    He told me that there was a

1    slip-and-fall that occurred in a parking lot.

2         Q.   And what did he ask you to do?

3         A.   He asked me to review the case file,

4    look at everything, look at the photos, and

5    give him my opinions about the case.

6         Q.   Other than him telling you this was a

7    slip-and-fall and asking for your opinions, did

8    he offer any commentary or description of the

9    case or his view of the case?

10        A.   We did discuss -- I mean, we did

11   discuss it that -- as far as his relevant

12   details, and then I reviewed the files.

13        Q.   I'll be very specific.  Did he say

14   anything along the lines that, Mr. Swenson, we

15   consider this case to be defensible?  We don't

16   think there's any liability?  We'd like you to

17   support that position?  Anything in that family

18   of conversation?

19        A.   No, no, no.  He was asking me to be

20   objective.

21        Q.   Okay.  He actually said that?

22        A.   Well, I don't recall if he said the

23   exact words, but he wanted my opinions on the

24   case.

25        Q.   Okay.  Have you worked with Mr.

1    Gibbons before?

2        A.    No.

3        Q.    Have you worked with his law firm

4    before?

5        A.    No.

6        Q.    Do you know how you were located as a

7    possible expert in the case?

8        A.    I do not.

9        Q.    Now, as I understand it, you said

10   earlier that you've worked in both defense

11   cases and plaintiff cases, but the ledger sort

12   of leans a little more in favor of plaintiff

13   cases.  Is that right?

14       A.    Yes.

15       Q.    In the case that you testified in

16   court, what case was that?

17       A.    I don't remember the name of the case.

18       Q.    Okay.  That's fair.  Where was the

19   case pending?

20       A.    It was in Independence.

21       Q.    Missouri?

22       A.    Yes.

23       Q.    And who was the lawyer you worked

24   with?

25       A.    I don't remember his name.  It was two

Page 11

1   or three years ago.

2        Q.    Would this be on your log of

3   testimony --

4        A.    Yes.

5        Q.    -- that you're going to provide to us

6   or you'll look for?

7        A.    Yes.

8        Q.    You do have such a log.  Did you say

9   that earlier?

10       A.    Yes, I do.

11       Q.    And was that for the plaintiff or the

12   defense?

13       A.    That was for plaintiff.

14       Q.    And what was the verdict?

15       A.    The plaintiff lost.

16       Q.    Okay.  So the jury rejected your

17   expert testimony?

18             MR. GIBBONS:  Object to the form

19   of the question.

20       A.    No, they didn't reject my expert

21   testimony.  I don't know all the details of the

22   case.  I mean, the case went on three or four

23   or five days.  I mean, there's many aspects to

24   a case.  So I don't know all the rest of the

25   details of the case.

1          Q.    Is it fair to say that you were there

2     to testify in support of the plaintiff's claim

3     that there was liability against the property

4     owner?

5          A.    Yes.

6          Q.    And I take it, given your resume, that

7     it had something to do with snow or ice

8     removal?

9          A.    Yes.

10         Q.    And is it fair to say your testimony

11     was that the property owner, or whoever was in

12     charge of snow and ice removal, failed to

13     exercise reasonable care?

14         A.    Yes.

15         Q.    And on that subject, the jury said no;

16     is that right?

17                    MR. GIBBONS:  Form of the

18     question, foundation.

19                    Go ahead.

20         A.    I don't know -- I wasn't privy to the

21     jury's deliberation or documentation, or I

22     didn't see any of that.  I just got called in

23     and testified and left, and wasn't informed of

24     all that.

25         Q.    Right.  But you know enough, given

1    your earlier testimony, that the jury did not

2    rule in favor of the plaintiff seeking to hold

3    the property owner liable; correct?

4         A.   Yes.

5         Q.   These sixteen cases that you've given

6    testimony in, I would assume that that does not

7    encompass all the cases you've consulted in for

8    litigation purposes.  Is that right?

9         A.   That's correct.

10        Q.   There might be some cases where you

11   were asked to consult and maybe provide a

12   report, but never gave testimony?

13        A.   Yes.

14        Q.   So let's see if we can get the

15   universe of the cases that you've done forensic

16   work in.  What would that number be,

17   approximately?

18        A.   I've never counted them.  So I don't

19   know the exact number.  I know it's at least

20   fifty.

21        Q.   Okay.  But sixteen you've given sworn

22   testimony?

23        A.   Yes.

24        Q.   And one, you've testified in court?

25        A.   Yes.

```
 1        Q.    And given what you've represented here

 2   as your resume or curriculum vitae, is it fair

 3   to say that those sixteen cases that you gave

 4   testimony in had to do with the subject of

 5   whether there was adequate or inadequate snow

 6   and ice removal?

 7        A.    Yes.

 8        Q.    And is it also fair to say that none

 9   of those cases involved, say, a defective

10   condition, as opposed to the presence of snow

11   or ice?

12        A.    What do you mean by defective

13   condition?

14        Q.    Well, let me just grab an example out

15   of the air.  You never testified in a case

16   where someone stepped in a hole and fell and

17   broke their ankle as they were heading to, say,

18   an office building?

19        A.    No.

20        Q.    Or someone tripped over a rise in

21   concrete as they were walking down a sidewalk?

22        A.    No.

23        Q.    That's what I mean by defective

24   condition.

25        A.    Okay.
```

1        Q.   Okay.  And so to go back to my

2    question, then, it's fair to say that those

3    sixteen cases you've given testimony in had to

4    do with the adequacy or inadequacy of snow and

5    ice removal, and not whether there was a

6    defective condition present; correct?

7        A.   Correct.

8        Q.   Now, we're going to talk about your

9    claims of expertise, but is it fair to say that

10   you hold yourself out as an expert in proper

11   snow and ice removal?

12       A.   Yes.

13       Q.   And as such, you've offered opinions

14   and done forensic work in litigation?

15       A.   Yes.

16       Q.   So do you know -- can you tell me in

17   your own words what the duty is that a property

18   owner or management company has regarding

19   protecting invitees from injury on their

20   premises.

21       A.   It sounds like more of a legal

22   conclusion.  I'm not an attorney.

23       Q.   Okay.  I'm not asking for any legal

24   opinions, because you don't -- you're not an

25   attorney.  But I'd like for you to tell me in

1   your own words what it is that you believe the

2   duty is of a property owner to someone who

3   comes onto their property as it relates to the

4   removal of snow and ice.

5                    MR. GIBBONS:   Form and

6   foundation.

7        A.   I believe there's a duty to provide

8   reasonable snow and ice removal services.

9        Q.   Do you agree that a property owner or

10   a manager of the property that's been delegated

11   by the property owner has a duty to realize

12   conditions that an entrant -- someone who's a

13   lawful entrant might not anticipate?

14                    MR. GIBBONS:   Form and

15   foundation.

16        A.   I do think it's important to be aware

17   of conditions of snow and ice on your property,

18   but it's impossible to be aware of it 100

19   percent of the time.

20        Q.   Right.   I didn't ask that.   What I'm

21   asking is, do you agree with me that a property

22   owner or someone charged with removing snow and

23   ice has a duty to remove risks of harm that a

24   reasonable person might not discover or

25   realize?

1          MR. GIBBONS:  Form and

2     foundation, asked and answered.

3          A.    I think within reason, yes.

4          Q.    And I take it, based upon your

5     reported experience in snow and ice removal,

6     that you would agree that someone who's in the

7     business of removing snow and ice is in a

8     better position to know what the risks are

9     presented to persons regarding snow and ice?

10          MR. GIBBONS:  Form and

11     foundation.

12          A.    Yes.

13          Q.    All right.  Let's talk about this

14     particular case.  When you visited the site on

15     August 16th, I believe is what you say, was

16     anyone with you?

17          A.    I did meet Mr. Gibbons there

18     initially.

19          Q.    So Mr. Gibbons met you at the U-Park

20     lot where this incident occurred with Ms.

21     Ackerman?

22          A.    Yes.

23          Q.    And was he there during your

24     inspection of the property?

25          A.    Yes.

1      Q.   How long did the inspection take?

2      A.   I think it was around thirty minutes.

3      Q.   We have some pictures that we might

4   talk about here that are part of your report.

5   Are those pictures you took on that day?

6      A.   Yes.

7      Q.   Are there any other pictures that you

8   took that are not produced as part of your

9   report?

10     A.   No.

11     Q.   Did Mr. Gibbons take any pictures?

12     A.   Not that I'm aware.

13     Q.   So tell me what happened when you got

14   there on the --  Did I have that date right,

15   August 16th?

16     A.   Let me look.  Yes.  August 16th, yes.

17   I arrived and looked at the parking lot,

18   examined the area where the snow was pushed

19   based on the photographs that were provided in

20   the case, and examined the area of the

21   slip-and-fall based on the photographs that

22   were provided.  And just looked at the layout

23   of the property.

24     Q.   Did Mr. Gibbons point out to you where

25   the area was where Ms. Ackerman fell?

1      A.    Yes.

2      Q.    And did he offer any narrative as to

3   what her testimony was, in a deposition or

4   otherwise?

5      A.    Not that I recall.

6      Q.    Did you look at any other parts of the

7   lot, other than the area around Parking Stall

8   153?

9      A.    I was mainly focused on the area where

10   the snow was pushed up by the fence, and the

11   general area in relationship to slope that

12   could be an issue, potentially, with ice

13   melting or freezing.  And I was examining those

14   areas.

15      Q.    So let's see if we can orient for the

16   purposes of our discussion.  You correct me if

17   I don't have it right.  The Stall 153 is more

18   or less on the south side of the lot?

19      A.    Yes.

20      Q.    And the Mattress Factory is more or

21   lesson on the west side of the lot?

22      A.    Yes.

23      Q.    And the walkway area and the area

24   where some snow is pushed when there's snowfall

25   is in the east or southeast corner of the lot?

 1          MR. GIBBONS:  Object to the form

 2     of the question.  Did you say walkway?

 3          Q.    There's an exit out of the lot; right?

 4     In the southeast corner?

 5          A.    Yes.

 6          Q.    Okay.  And is the snow more or less

 7     pushed, in your opinion, towards the southeast

 8     or east end of the lot?

 9          A.    Yes.  It appeared to be that way in

10     the photos, and that's where it was pushed, is

11     up against the fence -- fence line.

12          Q.    Now, I saw in your report --  Let me

13     see if I can find it.  You say on Page 4 under

14     Paragraph 1, Opinions and Conclusions, that the

15     parking lot was in excellent condition.  And

16     then you later on in your report also talk

17     about the general condition of the parking lot.

18     Is that still your testimony?

19          A.    Yes.  My reference here was to the

20     overall snow condition of the parking lot based

21     on the photographs that I reviewed.

22          Q.    And you say on Page 10 that it's your

23     opinion that the area of the parking lot where

24     the slip-and-fall incident occurred was not in

25     poor condition.  Is that still your testimony?

1      A.    Yes, that's my opinion.

2      Q.    And you say just above that also that

3   it is your opinion that the U-Park lot is in

4   average to above average condition for an

5   asphalt parking lot.  Is that still your

6   testimony?

7      A.    Yes.

8      Q.    Now, you don't have any special

9   expertise in asphalt repair or the application

10   of slurry or new asphalt or how to maintain an

11   asphalt parking lot, do you?

12      A.    No.  But I have examined thousands and

13   thousands of parking lots and asphalt parking

14   lots in my career; and I do own a commercial

15   building with an asphalt parking lot.  So I'm

16   very familiar with asphalt parking lots.

17      Q.    Right.  I can tell you in my 62 years,

18   I've parked in thousands of asphalt parking

19   lots myself.  What I'm asking you, sir, is you

20   don't hold yourself out as an expert in the

21   maintenance, the proper maintenance protocols,

22   or how to maintain the asphalt of an asphalt

23   parking lot; correct?

24            MR. GIBBONS:  Object to the

25   form.  Outside of snow and ice removal, of

1    course.

2         Q.    Right.  We're talking about outside of

3    snow and ice removal.  You're not here to tell

4    us you're an expert on asphalt parking lots,

5    how they should be maintained, how they should

6    be repaired, those kinds of things?

7                   MR. GIBBONS:  Form and

8    foundation.

9         A.    No.  I don't consider myself to be an

10   asphalt parking lot expert.

11        Q.    For example, you talk about in your

12   report the best practices for snow and ice

13   removal and standard of care and so on; right?

14        A.    Yes.

15        Q.    But you're not here to offer any

16   opinions on the best practice for asphalt

17   parking lot maintenance?

18                   MR. GIBBONS:  Form of the

19   question.

20        A.    No.

21        Q.    Okay.  Or what sort of preventive

22   maintenance protocols ought to be in place;

23   correct?

24                   MR. GIBBONS:  Object to the form

25   of the question.

```
 1        A.    No.

 2        Q.    Other than this one time on the 16th

 3   of August, a couple weeks before your report,

 4   when you were at the site of the fall with the

 5   defense lawyer, have you been to the U-Park

 6   parking lot on any other occasion?

 7        A.    I went -- I went there today and

 8   looked at it today.  So other than that, no.

 9        Q.    How long were you there?

10        A.    Today?

11        Q.    Yes, sir.

12        A.    Probably ten, fifteen minutes.

13        Q.    Did you take any pictures?

14        A.    Yes.

15        Q.    And where are those?

16        A.    It's on my phone.

17        Q.    Can I see those?

18        A.    Yeah.

19        Q.    While you're looking for that, did you

20   observe anything that changes your opinions in

21   this case?

22        A.    No.  I was interested because it had

23   just recently snowed here on Friday, and so I

24   was -- I went to the lot to look at where the

25   snow had been pushed in the lot to see if there
```

1    was melting or freezing that had occurred down

2    near the area of the slip-and-fall location.  I

3    took one photo.  So that's the photo

4    (Indicating).

5        Q.   All right.  So you just took one

6    picture?

7        A.   Yeah.

8        Q.   And this is a picture of Stall 153

9    looking generally east; is that right?

10       A.   Yes.

11       Q.   And this is something I'd ask that you

12   supply to us.  So I'd request that, this

13   photograph.

14            Looking at this picture on your

15   phone, and maybe revealing some other pictures,

16   you would acknowledge, would you not, that just

17   to the right of the No. 153, near the end of

18   where the car is parked in that stall, that

19   there is a discoloration and sort of a channel

20   that goes across the parking lot?

21            MR. GIBBONS:  Form of the

22   question.

23       A.   What channel are you talking about?  I

24   don't -- what do you mean?

25            MR. COOK:  Okay.  Would you read

1    back the question, please.

2                    (Requested portion of the record

3    was read.)

4                    THE WITNESS:  Okay.  Yes, I can

5    see that.

6    BY MR. COOK:

7        Q.   And what do you attribute that to?

8        A.   That is from water running across the

9    lot at some point.

10       Q.   I'll give you your phone back.  No

11   other pictures besides that one?

12       A.   No.

13       Q.   Okay.  And your decision to view the

14   property, was that your own, or did Mr. Gibbons

15   say you should go look at it before you give

16   your testimony?

17       A.   I got here early, and so I thought

18   that would be good to go do, based on the snow

19   that had come in.

20       Q.   What do you think of the snow and ice

21   removal on this property?

22                   MR. GIBBONS:  Well, are you

23   talking about my property?

24                   MR. COOK:  Yeah.

25                   MR. GIBBONS:  Well, that's

1    irrelevant.

2                    THE WITNESS:   It looks fine to

3    me.

4    BY MR. COOK:

5        Q.    What about the big pile of ice melt

6    that's on the sidewalk when you come in here?

7    Does that bother you?

8        A.    You know, I didn't really notice that.

9        Q.    Okay.  Have you spoken with the

10    Defendant in this case, Mr. Schmitt?

11        A.    Yes.

12        Q.    When was that?

13        A.    I believe there was a phone conference

14    call that I briefly had with him and Mr.

15    Gibbons just discussing his practices of snow

16    and ice removal.

17        Q.    Okay.  Give me an approximate date of

18    that.

19        A.    I don't recall the exact date, because

20    I didn't record it or anything like that.  It

21    would have been sometime in the summertime

22    before I did my report.

23        Q.    Okay.  And did you make notes of that

24    conversation?

25        A.    No.

1      Q.    No notes?

2      A.    No.

3      Q.    None?

4      A.    No.  I just listened to what he said,

5   and it was -- it lined up with the case files.

6      Q.    Why didn't you take any notes?

7      A.    I didn't feel I needed to.

8      Q.    How long was that conversation?

9      A.    I don't recall.  It wasn't real long.

10     Q.    Any other interactions with Mr.

11   Schmitt?

12     A.    No.

13     Q.    You've read his deposition?

14     A.    Yes.

15     Q.    Is there anything in his deposition

16   that you disagree with or question?

17     A.    Not that I can recall.

18     Q.    Put it another way, are you critical

19   of anything that Mr. Schmitt said in his

20   deposition?

21     A.    There's nothing that sticks out to me,

22   no.

23     Q.    Let me shift gears for a moment, and

24   we'll come back to your report.  As I

25   understand it, you yourself have been the

```
 1   subject or your company has been sued; is that

 2   right?

 3       A.   Yes.

 4       Q.   And you've been sued for alleged

 5   failure to properly remove snow and ice?

 6       A.   Yes.

 7       Q.   Where were those lawsuits?

 8       A.   In Kansas, Kansas City area.

 9       Q.   How many times have you been sued for

10   allegations of failure to properly remove snow

11   and ice?

12       A.   I don't know the exact number, because

13   I don't deal with -- I have a general manager

14   who deals with that.  And so I'm aware of it,

15   but I don't know the exact number.

16       Q.   Okay.  Give me your best estimate.

17       A.   Maybe eight.

18       Q.   Have any of those cases gone to trial?

19       A.   No.

20       Q.   Of those approximate eight, give or

21   take, have you paid any money or has your

22   manager or whoever would provide

23   indemnification paid any money in those

24   lawsuits?

25       A.   We turn it over to insurance.
```

1    Insurance handles it all.  We don't know what

2    they do exactly.

3        Q.   Have you given testimony or have any

4    of your workers given testimony in those

5    lawsuits?

6        A.   Yes.

7        Q.   When you say yes, would that be you?

8    You've given testimony?

9        A.   Yes.

10       Q.   Okay.  And how many times?

11       A.   I don't recall the exact number.

12   Maybe four.

13       Q.   Is that in addition to the four

14   depositions you've given as an expert?

15       A.   Yes.

16            MR. GIBBONS:  Sixteen.

17       Q.   Excuse me.  Sixteen.

18       A.   Yes.  In addition to the sixteen, yes.

19       Q.   So I would assume somewhere, that you

20   have a record of these lawsuits?

21       A.   No.

22       Q.   No record.  Do you have copies of the

23   depositions you've given four times?

24       A.   No.

25       Q.   Did you have the same insurance

1    company for this period of time that the eight

2    lawsuits, give or take, were filed?

3        A.   No.  It changes.

4        Q.   Okay.  Who do you presently have

5    insurance with?

6        A.   I don't know the names.  I don't

7    handle that part of it.

8        Q.   So as you sit here today, you can tell

9    me under oath that you don't know whether any

10   money's been paid in any of these lawsuits

11   against your company for failure to remove snow

12   and ice.  Is that your testimony?

13       A.   I do know that they've been settled.

14   I don't know exact numbers of all of them, no.

15       Q.   Okay.  And have the lawsuits been

16   against you personally, or against Snowmen,

17   Incorporated, or what have they been?

18       A.   I think it's Snowmen, Incorporated.

19       Q.   So any sort of a search of the dockets

20   in the Greater Kansas City Area would locate

21   those lawsuits?

22       A.   Yeah.  I don't know how attorneys

23   exactly do that, but it's -- I'm sure it's

24   public record somewhere.

25       Q.   Okay.  So you said earlier they were

```
 1    in Kansas City.  Is that Kansas City, MO, or

 2    Kansas City, Kansas?

 3         A.   I don't know.

 4         Q.   So of the eight or so lawsuits, are

 5    there any that stick out in your mind as to

 6    what the facts were?

 7         A.   No.  It's been -- it's been quite a

 8    while.  I haven't been involved in one for

 9    quite a while.

10         Q.   When was the last lawsuit?

11         A.   Well, I don't know the exact -- I

12    mean, I don't know the exact one.  My general

13    manager handles all of that for the company.

14         Q.   What's his name?

15         A.   Mike Hathcock.

16         Q.   Spell the last name for the court

17    reporter.

18         A.   H-A-T-H-C-O-C-K.

19         Q.   And so he would know when the last

20    lawsuit was?

21         A.   Yes.

22         Q.   Let's see if we can get it this way.

23    As I understand it, you formed your consulting

24    company in 2008.

25         A.   Yes.
```

1      Q.    Have you had lawsuits against Snowmen,

2  Inc. after 2008?

3      A.    Yes.

4      Q.    And the last lawsuit for allegations

5  of failure to properly remove snow and ice

6  would be approximately when, your best

7  estimate?

8      A.    Restate the question.

9      Q.    All right.  The last lawsuit or the

10  most recent lawsuit against Snowmen, Inc. would

11  have been brought approximately when, your best

12  estimate?

13      A.    Two or three years ago, to my

14  knowledge.

15      Q.    Okay.  Let's talk about your

16  schooling.  You do not hold a college degree;

17  correct?

18      A.    Correct.

19      Q.    You did attend community college, but

20  did not graduate; correct?

21      A.    Correct.

22      Q.    And this certification that you speak

23  about in your report -- I want to make sure I

24  get it correct -- you hold yourself out as a

25  certified snow professional?

```
 1        A.    Yes.

 2        Q.    And when did you obtain that

 3   designation?

 4        A.    I would say it was about five years

 5   ago.  So it would have been 2013 or so.

 6        Q.    Okay.  And as I understand it, you

 7   took a test on a computer for that

 8   certification?

 9        A.    Yes.

10        Q.    Is that a multiple choice, then?

11        A.    Yes.

12        Q.    How many questions?

13        A.    I believe it was 200.

14        Q.    How long was the test and how long did

15   they give you to take the test?

16        A.    Three hours.

17        Q.    Was it an open book?

18        A.    No.

19        Q.    Now, do you still have the study

20   materials that you studied to prepare for that

21   test?

22        A.    SIMA does provide training modules for

23   the different modules, and our company

24   does -- did purchase those for our company's

25   use.
```

1      Q.   Right.  So my question is, the study

2  material that you bought and that you studied

3  for the test, do you still have those?

4      A.   I believe that -- I personally do not.

5      Q.   But your company does?

6      A.   I think the company does, yes.

7      Q.   I'd ask that you collect those and

8  produce those.  How much does it cost to get

9  that designation?

10      A.   I don't remember.  I don't remember

11  the cost.  There is a price, a fee you pay.  I

12  don't remember the exact amount.

13      Q.   This company that you have, if I have

14  it correct, is called Snowmen, Incorporated?

15      A.   Yes.

16      Q.   Is that a copyright or a trademark?

17      A.   Yes.

18      Q.   And that was created in 2005, as I

19  understand it.

20      A.   Yes.

21      Q.   And you'd been in the mulch business

22  with some fellows and decided that you didn't

23  want to be a part of that, and they didn't want

24  to be part of snow removal; and so you parted

25  ways?

1            MR. GIBBONS:  Object to the form

2    of the question.

3        Q.   Do I have that correct?

4            MR. GIBBONS:  Same objection.

5        A.   Well, that's -- that seems kind

6    of -- I mean, I did have partners.  We ended

7    up buying each other out and moving on.

8        Q.   Uh-huh.  Who were those partners?

9        A.   Tom Cannon and Rick Ractor.

10       Q.   Do they still operate a business in

11   the Greater Kansas City Area?

12       A.   No.

13       Q.   Now, you tell us in your report that

14   you work full-time in the snow and ice removal

15   industry.  Is that true?

16       A.   Yes.

17       Q.   At least in this part of the country,

18   snow and ice is usually sometimes October,

19   maybe, to late April.  What do you do the rest

20   of the time?

21       A.   We do ongoing training.  We do

22   customer follow-up.  We do events.  We do --

23   our sales season starts in June.  We start

24   selling accounts in June.  And, you know, our

25   snow removal operation is so large that by the

```
 1    time the winter is over -- we don't declare the

 2    winter to be over until April 15th, and then we

 3    have a process of shutting down the winter.  By

 4    the time we have the winter shut down, it's

 5    time to start up again.

 6         Q.   What are these events you mentioned?

 7         A.   We are members of BOMA, the Building

 8    Owners and Managers Association, IREM,

 9    Institute of Real Estate Management.  We

10    sponsor -- or we go to their golf tournaments

11    and sponsor golf tournaments and go to

12    luncheons and different events.

13         Q.   And do you still have about fifteen

14    employees?

15         A.   Yes.

16         Q.   Are they full-time employees or

17    seasonal?

18         A.   Full-time.

19         Q.   So those people are working in the

20    summer also?

21         A.   Yes.

22         Q.   And tell us your physical location of

23    your business.

24         A.   11940 Cartwright Avenue.

25         Q.   Is that like a warehouse facility or
```

1    something?

2        A.   No.  It's a custom snow and ice

3    removal facility that I own.

4        Q.   Okay.  But it's a commercial area?

5        A.   Yes.

6        Q.   You tell us in your report that you're

7    also involved with something called SIMA, Snow

8    and Ice Management Association.  Is that right?

9        A.   Yes.

10       Q.   And how many members are there in

11   SIMA?

12       A.   Last I knew, there was 20,000 plus.

13       Q.   So in the properties that you handle

14   for snow and ice removal, can you tell us

15   approximately what your average revenue is for

16   that work?

17       A.   It varies depending on the contract

18   and depending on the season.

19       Q.   Right.  But an average.

20       A.   For Snowmen?

21       Q.   Yes, sir.

22       A.   It's around six million dollars a

23   year.

24       Q.   All right.  And then for Swenson

25   Consulting, again, I'm sure that varies, but on

1    average, what is the income for that consulting

2    business?

3         A.   It's around 100,000.

4         Q.   Then specifically within that

5    consulting business, how much revenue annually,

6    approximately, from doing forensic work like in

7    this case?

8         A.   All of it.

9         Q.   Okay.  I see in your report that you

10   say that you've managed and overseen snow and

11   ice removal on over 10,000 acres of parking lot

12   pavement and over 28,000,000 square feet of

13   sidewalk.  How did you calculate that number or

14   those numbers?

15        A.   We have a total of our -- total number

16   of acres that we service every winter season,

17   and how many million square feet of sidewalks

18   that we service in a winter season.

19        Q.   I was interested in and I was not sure

20   what you were saying when you said you're an

21   expert on snow and ice removal contract

22   analysis.  What does that mean?

23        A.   I prepare thousands and thousands of

24   contracts, snow and ice removal contracts,

25   every year.  So I examine contracts, snow and

1    ice removal contracts, prepare them and examine

2    them.  Thousands of them annually.

3         Q.   All right.  Let's go back to the facts

4    of this case.  You set forth in your report the

5    weather data from the National Oceanic and

6    Atmospheric Administration for February 2016 in

7    Omaha; is that right?

8         A.   Yes.

9         Q.   And do you know where that recording

10   station is in relationship to where the fall

11   was?

12        A.   No.

13        Q.   You do know from your experience that

14   weather conditions can vary and that an

15   official reporting station might not always

16   report accurately the conditions at another

17   location?

18                  MR. GIBBONS:  Form and

19   foundation.

20        A.   Yeah, it's possible there can be some

21   variance.

22        Q.   And you have no way of knowing there

23   was a variance from what is in the NOAA report

24   and what was actually at the site of the fall;

25   correct?

```
 1              MR. GIBBONS:  Form and

 2    foundation.

 3         A.   Correct.

 4         Q.   Okay.  But let's talk about what you

 5    do have in your report.  You say that the NOAA

 6    report shows it snowed 4.9 inches on February

 7    2nd, an additional .6 inches of snow on

 8    February 5th, and again on February 7th, and

 9    that the record reflects a high temperature of

10    37 degrees on February 10th.  So can we agree

11    that prior to Ms. Ackerman's fall, there was

12    snow that was recorded in the Omaha area and

13    that there was some thawing and freezing?

14              MR. GIBBONS:  Form of the

15    question.

16         A.   Yes, I do believe that happened.

17         Q.   Correct me if I'm wrong here, sir, but

18    you say an additional .6 inches of snow in

19    Omaha on February 5th and again on February

20    7th.  Is that 1.2 total?

21         A.   I would have to look at the record --

22    the actual record.  I don't have it in front of

23    me.

24         Q.   Okay.  But the way I read that is

25    you're saying .6 inches of snow on February 5th
```

1    and again on February 7th.

2         A.    Uh-huh.

3         Q.    Is that designed to say that on those

4    two dates, there was about .6 inches of snow

5    precipitation?

6         A.    My memory -- if my memory serves me

7    right, there was .6 inches and there was a

8    trace, I think, on the 7th.  So it was just a

9    little tiny -- like a trace, if I remember

10   right.

11        Q.    Okay.  But we have the official

12   records.  We can rely upon those as what was at

13   least recorded at the recording station.  Mr.

14   Gibbons is graciously handing me the report.

15            So you correct me, but it does

16   look to me, looking at the report on both of

17   those dates, there was .6 inches of snow -- new

18   snow in that column on both those dates.

19        A.    Yes.  That is correct.

20        Q.    Okay.  So math was never my strong

21   suit, but if we add the 4.9 inches on February

22   2nd, the .6 inches on February 5th and the .6

23   inches on February 7th, we get to over a half a

24   foot of snow that had fallen prior to Ms.

25   Ackerman's fall; right?

```
 1        A.    Yes.   That's over a long period with
 2    temperatures also rising well above freezing,
 3    up to 45 degrees on the 7th.
 4        Q.    What was the date of this fall?
 5        A.    It was on the 13th.
 6        Q.    So basically, over a ten-day period?
 7        A.    Yes.
 8        Q.    And so just so we're communicating,
 9    then, over this approximate ten-day period,
10    including the day of her fall, there had been
11    approximately a foot -- over a foot of snow in
12    the Omaha area prior to her fall; right?
13        A.    It was --
14              MR. GIBBONS:   Form of the
15    question.
16        A.    It was six inches.
17        Q.    Half a foot.
18        A.    Yes.
19        Q.    Okay.  So let me restate that.  In the
20    days leading up to her fall, the approximate
21    ten days prior, there had been over a half a
22    foot of snow in the Omaha area; correct?
23              MR. GIBBONS:   Form of the
24    question.
25              Go ahead.
```

1      A.   Yes.

2      Q.   Okay.  Thank you.  You indicate that

3   you reviewed the Defendant's Answers to

4   Plaintiffs' Interrogatories; is that right?

5      A.   Yes.

6      Q.   Did you accept all those Answers as

7   true?

8      A.   Yes.

9      Q.   Do you know anything about Mr. Joseph

10  Schmitt's background?

11     A.   No.

12     Q.   Do you know if he belongs to any of

13  these associations you belong to?

14     A.   I do not.

15     Q.   You do know that he uses a Road Runner

16  deicer?

17     A.   Yes.

18     Q.   What sort of deicer does the Snowmen

19  company use?

20     A.   We use -- Road Runner is magnesium

21  chloride.  So we do use magnesium chloride as

22  well.  We use a number of different products.

23     Q.   Do you also use sand?

24     A.   We do not use sand, no.

25     Q.   Why not?

```
 1        A.   We find sand to be -- it doesn't melt
 2   snow or ice, and it ends up causing a problem
 3   with -- people actually slip on the sand.
 4        Q.   Have you used sand in the course of
 5   doing snow and ice removal?
 6        A.   Not at Snowmen, no.
 7        Q.   Some people do use sand; right?
 8        A.   Some, yes.
 9        Q.   Do you know if Mr. Schmitt used sand
10   on any of the parking lots that he operated,
11   including the one where Ms. Ackerman fell?
12        A.   I'm not -- I just -- I don't believe
13   he did.  I'm -- I know he didn't on the lot
14   where the slip-and-fall occurred.
15        Q.   Now, you say that Exhibit 5 shows a
16   picture of Road Runner deicer and a black ice
17   area.  And I'll show you Exhibit 5, so you're
18   not disadvantaged.  I'm handing you Exhibit 5.
19   Do you see that (Indicating)?
20        A.   Yes.
21        Q.   And we can agree that what's depicted
22   in Exhibit 5 is a black icy area?
23        A.   Yes.
24        Q.   All right.  And I trust that --
25   Sorry.  I didn't mean to take that back from
```

1    you so quick -- that you would also agree with

2    me that that black ice area shown in the Stall

3    153 is certainly big enough for someone to slip

4    and fall on?

5                    MR. GIBBONS:   Form and

6    foundation.

7        A.   I think, yeah, it's possible.

8        Q.   Okay.   Let me shift gears again just

9    to kind of give you an introduction to what

10   we're going to talk about.   In reviewing the

11   materials in this case, including the testimony

12   of Mr. Schmitt, the records, including the

13   Interrogatory Answers, and drawing upon your

14   claimed experience in the area of snow and ice

15   removal, do you have any recommendation for

16   improvement for Mr. Schmitt and U-Park for

17   maintenance of their parking lot in the future?

18                    MR. GIBBONS:   Form and

19   foundation.

20       A.   What do you mean by maintenance of the

21   parking lot in the future?

22       Q.   Snow and ice removal.

23       A.   Oh, snow and ice removal.   No, I don't

24   find anything that he did to be unsatisfactory

25   or unreasonable in regards to snow and ice

1    removal.

2        Q.   And to be specific, so you and I are

3    communicating, do you have any suggestions for

4    him to make the parking lot safer for patrons

5    with regard to snow and ice removal?

6              MR. GIBBONS:   Form and

7    foundation.

8        A.   I analyzed the case based on, you

9    know, the temperatures at the time, the photos,

10   the amount of snow that had fallen.  You know,

11   six days earlier was the latest that any snow

12   had fallen.  Looking at the temperatures.  And

13   I don't believe there's anything that he could

14   have done to be more reasonable, no.

15       Q.   What if he'd have walked the lot and

16   saw that black ice and put down the ice melt

17   prior to Ms. Ackerman coming across that part

18   of the parking lot?  Would that have been

19   something that would have made the condition

20   safer?

21             MR. GIBBONS:   Form of the

22   question.

23       A.   I think in a perfect scenario, if he

24   knew exactly when that circle happened and when

25   it froze, I think it could have been good if he

1    would have known the exact time, yes.

2         Q.    Okay.  It's his parking lot; right?

3         A.    Yes.

4         Q.    And you saw in the testimony that he

5    at least one time a day walks the parking lot?

6         A.    Yes.

7         Q.    And some might suggest that's to see

8    if people have paid.  Some other people might

9    suggest that's to do an inspection.  But you

10   didn't see any testimony that he walks it more

11   than once; correct?

12        A.    It's my understanding that he was

13   working there the day of the incident.

14        Q.    Right.  But he only walked the lot

15   once?

16        A.    As far as I know, that's correct.

17        Q.    And had he walked the lot and observed

18   this black ice that's shown in Exhibit 5, would

19   it have been reasonable for him to apply the

20   Road Runner deicer that he did after the fall

21   before the fall?

22              MR. GIBBONS:  Form and

23   foundation, calls for speculation.

24        A.    Yeah.  He seems to be very conscientious

25   in his snow and ice removal duties.  And I

 1    think if he would have seen it, he probably

 2    would have put deicer on it, is my opinion.

 3         Q.   Okay.  That would have been

 4    reasonable?

 5              MR. GIBBONS:  Form and

 6    foundation, calls for speculation.

 7         A.   Yeah, that would be reasonable.  But

 8    it's -- I don't believe that it's also

 9    reasonable to have 100 percent of an entire

10    parking lot 100 percent clear all of the time,

11    and I don't believe it's reasonable for a

12    property owner to have that expectation of

13    their parking lot.

14         Q.   Now, let's talk about a different

15    subject, and that is the subject of birdbaths.

16    And you've included in your report what you

17    claim to be a photograph of birdbaths; is that

18    right?

19         A.   Yes.

20         Q.   And you would agree with me, would you

21    not, that there are variant degrees of

22    birdbaths?

23         A.   Yes.

24         Q.   One that can be quite deep and have an

25    inch or two of moisture; right?

1      A.    Yes.

2      Q.    And one that might be a slight

3    depression that maybe has a half an inch of

4    depression or maybe even less that allows for

5    the collection of moisture; correct?

6              MR. GIBBONS:  Form and

7    foundation.

8      A.    Yes.  There are varying degrees of

9    birdbaths caused by the tires of cars and

10   vehicles, yes.

11     Q.    Right.  And they can be caused by

12   other things too; right?

13     A.    It's possible, yes.

14     Q.    For example, in this case, are you

15   aware that Mr. Schmitt was involved in actually

16   seeing that a power line was tunneled

17   underneath the asphalt in this area, near the

18   area where Ms. Ackerman fell?

19              MR. GIBBONS:  Form and

20   foundation, mischaracterizes the testimony.

21     A.    I did see the testimony discussion

22   about that, yes.

23     Q.    And so doing work underneath an

24   asphalt lot can have an impact on whether

25   there's a depression or not, can't it?

1              MR. GIBBONS:  Form and

2    foundation.

3         A.   Yes, it can.

4         Q.   Now, I'm going to ask a question here

5    that you can consider a hypothetical, if you

6    like.  I'm going to hand you Exhibit 5, so

7    we're both on the same page.  And just so our

8    record is correct, set the stage here, we're

9    looking at Exhibit 5, Stall 153 in the

10   southeast corner of the lot adjacent to where

11   the exit is from the lot.  And it shows the

12   black ice that we've talked about and a bag of

13   the Road Runner ice melt; correct?

14              MR. GIBBONS:  Form of the

15   question.

16        A.   Yes.

17        Q.   Okay.  And here is what I want to ask

18   you.  Regardless of what caused this black

19   ice -- and you've offered some speculation as

20   to possible causes -- regardless of what caused

21   it, you would agree with me that if Mr.

22   Schmitt, in surveying the condition of his lot,

23   had seen this, it would be reasonable for him

24   to put down Road Runner ice melt; correct?

25              MR. GIBBONS:  Form and

1    foundation, calls for speculation.

2        A.   Yeah.  I think pretty much anyone, if

3    they had seen an icy condition and had ice melt

4    available to them, that they would probably put

5    some deicer on it in the wintertime.

6        Q.   Right.

7        A.   I think that's a reasonable thing to

8    do.

9        Q.   Right.  And we know that he did that

10   after the fact here too; correct?

11       A.   Yes.

12            MR. GIBBONS:  Form.

13       Q.   In fact, you saw in this record an

14   actual photograph, a close-up photograph -- I

15   think it's Exhibit 6 -- after the -- presumably,

16   after the ice melt had been applied that shows

17   the change in the moisture condition; right?

18       A.   Yes.

19       Q.   All right.  I want to talk to you

20   about some things in your report on Page 5.

21   You say that the U-Park, Inc. parking lot is

22   not characterized as a high-profile commercial

23   lot.  What does that mean?

24       A.   There are different buildings in the

25   snow and ice removal business that some are

 1    higher profile than others.  Like hospitals and

 2    medical facilities would be considered

 3    high-profile commercial parking lots.

 4         Q.   I just want to make sure I'm

 5    understanding you.  You're not saying that

 6    U-Park doesn't have the same duty as everyone

 7    else to maintain this lot in a reasonable

 8    manner, just because it's not a hospital

 9    parking lot, are you?

10              MR. GIBBONS:  Object to the form

11    of the question, calls for a legal conclusion.

12              Go ahead.

13         A.   No.  In my report, my intention was to

14    state that there are different trigger depths

15    depending on when people usually start doing

16    snow removal from parking lots.  One-inch

17    trigger or two-inch trigger is pretty standard

18    in the industry.  And a one-inch trigger is

19    used on what would be considered more of a

20    higher profile parking lot.  And the U-Park

21    lot, Mr. Schmitt had decided to remove snow at

22    one-half of an inch.  And one-half of an inch

23    is just, in my opinion, above and beyond when

24    99 percent of people start performing snow and

25    ice removal services.  It's an indication of,

1    you know, his diligence and his desire to do a

2    good job and be very reasonable.

3         Q.   Do you have any proof, other than his

4    self-serving testimony, that he actually plows

5    the lot under a one-half inch trigger depth?

6              MR. GIBBONS:  Form of the

7    question.

8         Q.   I mean, have you been there to see it?

9    Have you looked at any other evidence to

10   corroborate that?

11        A.   No.

12        Q.   Okay.  And by the way, in the business

13   of making money plowing and removing snow, the

14   lower the trigger depth is, the more

15   opportunities there are to plow snow; right?

16        A.   Yes, I guess that would be true.

17        Q.   And you don't know the precise

18   financial arrangement between U-Park and the

19   owner of this particular lot as it relates to

20   who benefits from the frequency to which the

21   lot is plowed, do you?

22        A.   No.  I did not analyze that.

23        Q.   You say on Page 6 that, quote, it is

24   industry standard to have a reasonable

25   inspection program in place for melting and

1    refreezing of snow.  What do you claim was the

2    reasonable inspection program that Mr.

3    Smith -- Mr. Schmitt.  Excuse me.  You say

4    Smith in your report -- that Mr. Schmitt

5    employed on this lot on the day in question?

6        A.    Well, he says in his deposition

7    testimony that he visits the lot once a day and

8    inspects it in the winter months, and then he

9    was working there the day of the incident.  And

10   so that was an inspection.  There's also in the

11   industry at some point, once you get beyond a

12   snow or ice event, it's not really reasonable

13   to inspect the parking lot every single day,

14   you know, day after day, after day, after day.

15   And so I just looked, and I believe he was very

16   reasonable in his inspection processes.

17       Q.    Okay.  And I think we talked about

18   this earlier, but you correct me if I'm wrong.

19   You're talking about snow and ice; right?

20       A.    Yes.

21       Q.    What's reasonable or not reasonable;

22   right?

23       A.    Yes.

24       Q.    You're not here to offer any opinions

25   about defective conditions in asphalt and

1    what's reasonable and not reasonable; correct?

2                    MR. GIBBONS:   You mean other

3    than what you already asked him?

4        A.    Defective asphalt -- I mean, I already

5    said I'm not an expert in asphalt; but I am an

6    expert in examining parking lots in regards to

7    snow and ice melting or refreezing and

8    examining lots for melt/refreeze.   I am an

9    expert in that.

10       Q.    Okay.   And Mr. Gibbons has reminded me

11   that we've talked about this already.   So thank

12   you.   Now, you say on Page 8 -- you offer some

13   speculation that a car or truck probably pulled

14   into this Parking Space 153, sat idling for a

15   period of time, and then after it shut off,

16   there's moisture and condensation that leaked

17   out of the tail pipe, onto the ground, and

18   froze into the patch of black ice.   That's one

19   of your theories; right?

20       A.    Yes.   I have seen that happen before.

21       Q.    Okay.   So that there's not anything --

22   Strike that.   That's not an uncommon occurrence

23   that you've seen in your experience?

24       A.    I know it's -- it does happen.

25       Q.    And knowing that that does happen,

1    what reasonable steps should a parking lot

2    operator take to ensure that that condition

3    does not present an unreasonable risk to

4    patrons of the parking lot?

5        A.   Well, I've never heard of, I mean,

6    that condition becoming a dangerous condition.

7    I just know that I've seen water drip out of

8    the backs of pipes and after examining the case

9    files, it's my opinion that the -- that there

10   was not melting and refreezing from snow piles

11   that caused the black ice.  And so as far as

12   what caused a patch of black ice, you know,

13   I -- to me, it's either someone threw a water

14   bottle down or a cup out, or it dripped from a

15   tile pipe.  It's something very strange that is

16   not a result of improper or unreasonable snow

17   and ice removal on the part of U-Park or Mr.

18   Schmitt.

19       Q.   I know that's your opinion, and you

20   know that Ms. Ackerman's expert witness

21   disagrees with that point of view; right?

22       A.   I'm -- are you saying that his opinion

23   is that it's from melting and refreezing of

24   snow piles?

25       Q.   Let's just get at it this way.  This

1    is preliminary to a question I'm going to ask

2    you.

3        A.   Okay.

4        Q.   You know from reading the report from

5    Ms. Ackerman's expert that he holds opinions

6    that you disagree with; right?

7        A.   Yes.

8        Q.   In fact, I think you said you disagree

9    with all of his opinions.

10       A.   Yes.

11       Q.   And, of course, the meat of his

12   opinion is that there was an unreasonable risk

13   of injury presented to Ms. Ackerman, that

14   U-Park did not exercise reasonable care; right?

15       A.   Yes.  That's his belief.

16       Q.   Okay.  And so here's what I want to

17   get to.  You hold the opinion, you've told us a

18   couple times, that U-Park was reasonable in its

19   removal of snow and ice; correct?

20       A.   Yes.

21       Q.   And you suggest that this black ice

22   that we've both agreed existed must have been

23   caused by something else, other than the

24   failure to properly do standard snow and ice

25   removal; right?

1      A.    Yes.

2      Q.    So if we start there, and we know that

3   there's black ice presented on this parking

4   lot, whatever its cause, is it your claim that

5   Mr. Schmitt has no duty to protect people from

6   that hazard?

7                    MR. GIBBONS:   Form and

8   foundation.

9      A.    It isn't standard in the industry six

10  days after the last snow to have 100 percent of

11  a parking lot completely free of ice.  No,

12  that's not reasonable.

13     Q.    I'm not asking you that.  Follow me

14  here for a moment.  We can agree there was

15  black ice in Slot 153; right?

16                   MR. GIBBONS:   Form and

17  foundation.

18     A.    Yes.

19     Q.    And we can agree that the ice melt

20  would address that black ice, because we know

21  that that happened afterwards; right?

22     A.    Yes.

23     Q.    And regardless of where this black ice

24  came from, is it your claim that Mr. Schmitt

25  had no duty to protect people who were paying

1    to park in his lot from this condition?

2                    MR. GIBBONS:  Form of the

3    question, calls for a legal conclusion as to

4    duty.

5        A.   Yeah, it -- yes, it's my opinion that

6    he was reasonable in his snow and ice

7    remediation efforts.  And that's my opinion.

8        Q.   So if he walks past 153 and sees this

9    black ice, he can just keep on walking and not

10   do anything about it?

11                   MR. GIBBONS:  Form of the question,

12   calls for speculation, mischaracterizes his

13   testimony.

14       Q.   Regardless of where it came from?

15                   MR. GIBBONS:  Same objections.

16       A.   I think in a perfect world, that would

17   be great if every single piece of black ice or

18   ice could be remediated if people walk by and

19   threw something on it.  I think that would be

20   great.

21       Q.   So are you saying he could just walk

22   past it and not do anything?

23                   MR. GIBBONS:  Form of the

24   question.

25       A.   That's a hypothetical question, and I

1    just -- I don't necessarily agree with that

2    question.

3        Q.   I'm not asking you to agree with the

4    question.  Here's the question.  If Mr. Schmitt

5    had walked past Slot 153 and seen this black

6    ice, which we know can be remediated by ice

7    melt because it was done after the fact, is it

8    your opinion, as a purported expert in the

9    field of snow and ice removal and parking lot

10   conditions, that Mr. Schmitt can just walk past

11   this and do nothing?

12              MR. GIBBONS:  Form of the

13   question, asked and answered, calls for

14   speculation.

15       A.   I mean, honestly, we don't know when

16   that occurred.  We don't know how -- I mean,

17   the temperatures that were outside, that

18   melting or that black ice could have occurred

19   after he walked by that area three different

20   times that day.  We don't know exactly how long

21   it was there.  But if he did walk by it, and in

22   a perfect world, and he had ice melt then, yes,

23   it would be good to remediate it.

24       Q.   Let me see if I can get at the same

25   concept a little different way.  You do agree

1    that --  And again, I'm not asking you for a

2    legal opinion.  I'm asking based upon your

3    claimed experience.  You do agree that property

4    owners or someone charged with keeping a

5    parking lot safe has a reasonable obligation to

6    remediate or warn of risks that are on the

7    property?

8              MR. GIBBONS:  Object to the form

9    of the question, calls for a legal conclusion.

10        A.   Yes, within reason.

11        Q.   Okay.  And so let's see if I can use

12   an example different than what's shown in

13   Exhibit 5.  If there was a big pile of vomit

14   right there, would Mr. Schmitt have any

15   obligation to put up a sign that says wet floor

16   or clean it up?

17             MR. GIBBONS:  Form of the

18   question, calls for a legal conclusion,

19   foundation, calls for speculation.

20        A.   Yeah, that's a total hypothetical.

21   And I didn't really analyze cleaning up vomit

22   in a parking lot.

23        Q.   What if there was -- I noticed coming

24   in here in Mr. Gibbons' office today that just

25   down the street, it looks like somebody's

1    windshield was busted out or there was some

2    kind of a car accident; and there's a

3    considerable amount of broken glass in the

4    street that is just outside of this law office.

5    If there was a considerable pile of broken

6    glass in this lot, say, in Spot 153 near the

7    exit of this lot, do you think that a person

8    like Mr. Schmitt would have any obligation to

9    do anything about that?

10                    MR. GIBBONS:  I object to the

11   form of the question, calls for speculation,

12   not a proper hypothetical.

13       A.   Yeah, I've just never really thought

14   those scenarios through.  I think -- I guess it

15   would be good to clean it up.  Sure.

16                    MR. GIBBONS:  You were really

17   observant coming into this office today.  And

18   for the record, it's a block down, just so

19   we --

20                    MR. COOK:  This is off the

21   record.

22                    (An off-the-record discussion

23   was held.)

24   BY MR. COOK:

25       Q.   So we're going to get to Mr. Philip

1  Wayne's opinions, but you say on Page 9, quote,

2  I disagree with all of Mr. Philip Wayne's

3  opinions in his expert report.  Is that still

4  your testimony?

5      A.   Yes.

6      Q.   There's nothing you agree with;

7  correct?

8      A.   Not that I can recall.

9      Q.   Okay.  And then as I understand it,

10  you take issue with Mr. Wayne's experience and

11  say he's not a real expert in this case.  He

12  doesn't know anything about snow and ice.  Is

13  that the gist of what you're telling us?

14      A.   He is not a snow and ice removal

15  expert, no.

16      Q.   But he does have a lot of experience

17  in property management; is that right?

18      A.   Yes.

19           MR. GIBBONS:  Foundation.

20      A.   Yes, it appears that way.

21      Q.   By the way, this is a common tact that

22  you employ when you serve as an expert, isn't

23  it, that when you're an adverse expert to an

24  expert on the other side of the case, it's a

25  common practice for you to say, well, they're

1    not really a Snowman like me.  They don't

2    really have the snow and ice expertise that I

3    have.  They're just an architect or an engineer

4    or a property manager.  That's a common theme

5    in your report, isn't it?

6              MR. GIBBONS:  Form and

7    foundation.

8        A.   No, it's not.  There are other snow

9    experts out there.  I believe in bringing in a

10   qualified expert.

11             MR. COOK:  Okay.  I'm going to

12   ask the court reporter to read back the

13   question, because I'm not sure you heard it.

14             (Requested portion of the record

15   was read.)

16             THE WITNESS:  I was asked to

17   review and analyze his expert report.  And so

18   one of the things I do analyze and look at is,

19   you know, what experience does the expert have

20   in snow and ice removal?  What are their

21   qualifications?  And I do comment on that, and

22   I do look at their opinions and comment on

23   their opinions, yes.

24   BY MR. COOK:

25       Q.   Okay.  So you would agree with me,

1    then, that there would be cases where you've

2    offered opinions about the snow and ice

3    removal, and you have contrasted your expertise

4    claimed with the background and expertise and

5    the qualifications of an expert you're

6    testifying against.  You've done that before,

7    whether they be an engineer or an architect or

8    property manager, and have tried to distinguish

9    their expertise from your claimed expertise;

10   right?

11       A.   Yes.

12       Q.   How long have you been paid 295 for

13   your testimony?  Has that always been the rate

14   that you charge for your testimony?

15       A.   It varies.

16       Q.   I'm sorry.  I didn't understand that

17   answer.  Does it vary from case to case?

18       A.   Sometimes.

19       Q.   So there's some cases when you charge

20   more for your testimony?

21       A.   Yes.

22       Q.   Why is that?

23       A.   It depends on how busy I am.

24       Q.   And there are some times you charge

25   less for your testimony than 295?

     1        A.   Yes.   Wait.   Yes -- no.   Wait.   Not

     2   for testimony, no.

     3        Q.   In any event, we can agree regardless

     4   of the amount, in this case it's 295,

     5   regardless of the amount that you are paid for

     6   your testimony?

     7        A.   Yes.

     8        Q.   Okay.   You have not met Ms. Ackerman?

     9        A.   No.

    10        Q.   You have not talked to her?

    11        A.   No.

    12        Q.   Did you read her deposition?

    13        A.   Yes.

    14        Q.   You have not met Mr. Ackerman?

    15        A.   No.

    16        Q.   You have not talked to him?

    17        A.   No.

    18        Q.   Did you read his deposition?

    19        A.   Yes.

    20        Q.   Do you have any reason to believe they

    21   gave untruthful testimony?

    22        A.   No.

    23        Q.   May I come around there and show you a

    24   page from your report?

    25        A.   Yes.

```
 1                    (An off-the-record discussion

 2    was held.)

 3    BY MR. COOK:

 4        Q.   Sir, I have Page 13 of your report,

 5    and there's a photograph.  I just want to make

 6    sure I'm understanding it.  You have some

 7    bluish green arrows, one of which I've

 8    highlighted; and one of these arrows is running

 9    more or less from the northwest to the

10    southeast, across the lot in more or less the

11    area of Spot 153.  Is that right?

12        A.   Yes.

13        Q.   And am I to understand that that

14    dotted arrow that you put there is to represent

15    the area of drainage from the lot?

16        A.   Yes.

17                    (An off-the-record discussion

18    was held.)

19    BY MR. COOK:

20        Q.   Page 14 has a photograph that is the

21    same area that we were just discussing, just

22    from a different angle (Indicating)?

23        A.   Yes.

24                    MR. COOK:  Those are all the

25    questions I have.  Thank you for your
```

1    testimony.

2                    MR. GIBBONS:  I don't have any

3    questions.

4                    THE DEPOSITION OF JEREMY E.

5    SWENSON, CSP, is now complete.  When

6    transcribed, the original of the deposition

7    shall be given to Mr. Guy R. Cook.  The

8    original exhibits shall be distributed as

9    follows:  Exhibit No. 26 will be enclosed with

10   the original transcript.

11                   (Deposition concluded at 2:36 p.m.)

12                   (UNLESS OTHERWISE DIRECTED BY

13   COUNSEL OR THE PARTIES HERETO, THE STENOGRAPHIC

14   NOTES FOR THE FOREGOING DEPOSITION SHALL BE

15   DESTROYED AFTER A PERIOD OF 3 YEARS FROM THE

16   DATE OF TAKING OF SAID DEPOSITION.)

17

18

19

20

21

22

23

24

25

```
 1                    SIGNATURE PAGE

 2                    I, JEREMY E. SWENSON, CSP, the

 3    witness in the foregoing deposition, do hereby

 4    certify that I have read the foregoing 68 pages

 5    of typewritten material and that the same is,

 6    with the corrections noted on the attached

 7    page, if any, a true and correct transcription

 8    of my deposition upon oral examination given at

 9    the time and place herein stated.

10

11

12

13

14
                                JEREMY E. SWENSON, CSP
15

16

17       Subscribed and sworn to before me this _____

18    day of _____, 2018.

19

20

21                      _____
                                Notary Public
22

23

24

25
```

1          CORRECTION/CHANGE SHEET
              I have read the entire transcript of my
2    deposition taken on the 13th day of November,
     2018, or the same has been read to me.  I
3    request that the following changes be entered
     upon the record for the reasons indicated.  I
4    have signed my name to the signature page and
     authorize you to attach the same to the
5    original transcript.

6    Page     Line     Correction or change and reason
                       therefor

7    _____  _____  _____

8    _____  _____  _____

9    _____  _____  _____

10   _____  _____  _____

11   _____  _____  _____

12   _____  _____  _____

13   _____  _____  _____

14   _____  _____  _____

15   _____  _____  _____

16   _____  _____  _____

17   _____  _____  _____

18   _____  _____  _____

19   _____  _____  _____

20   _____  _____  _____

21   _____  _____  _____

22   _____  _____  _____

23   _____  _____  _____

24

25   Date _____  Signature _____


Huney-Vaughn Court Reporters, Ltd.
515-288-4910

1                    C E R T I F I C A T E

2

3          I, the undersigned, Certified and
   Registered Professional Reporter, duly
4  appointed commissioner for the purpose of
   administering an oath to this witness, do
5  hereby certify that I acted as the shorthand
   reporter in the foregoing matter at the time
6  and place indicated herein; that I took in
   shorthand the proceedings had at said time and
7  place; that said shorthand notes were reduced
   to print under my supervision and direction by
8  means of computer-aided transcription, and that
   the foregoing pages are a full and correct
9  transcript of the shorthand notes so taken;
   that said deposition was submitted to the
10 witness for signature, as requested to do so by
   a party or the witness; that any changes, if
11 any, requested by the witness are attached
   hereto.

12

13         I further certify that I am neither
   attorney nor counsel for, or related to or
14 employed by any of the parties in the foregoing
   matter, and further that I am not a relative or
15 employee of any attorney or counsel employed by
   the parties hereto, or financially interested
16 in the action.

17         IN WITNESS WHEREOF, I have hereunto set
   my hand and seal this 13th day of November,
18 2018.

19

20 _____
                 STEPHANIE J. COUSINS
21               CERTIFIED & REGISTERED
                 PROFESSIONAL REPORTER
22

23

24

25

Huney-Vaughn Court Reporters, Ltd.
515-288-4910