August 30, 2018

Jeremy E. Swenson, CSP
Swenson Consulting
11940 Cartwright Avenue, Suite 300
Grandview, MO  64030

Woodke & Gibbons P.C.
Attn:  Mike Gibbons
619 N 90th Street
Omaha, NE  68114

Dear Mike:

This report has been generated to forward snow and ice expert observations, conclusions, and opinions related to a slip and fall incident that occurred February 13, 2016 in the U-Park parking lot adjacent to the Old Mattress Factory in Omaha, NE.  These observations, conclusions, and opinions have been developed by reviewing case documents in the Tonia Ackerman and Dennis Ackerman v. U-Park, Inc. case.  The case is filed in the United States District Court for Nebraska.  Case number:  8:17-CV-209.

## Introduction:

My name is Jeremy Swenson, and I have been retained by Woodke & Gibbons P.C. on behalf of U-Park, Inc.  I have been asked to review case documents and to opine on the snow and ice removal services that were provided by U-Park, Inc.  I have also been asked to review the snow and ice removal plans, policies, and procedures used by U-Park, Inc., and to review pictures of the area where the incident occurred.  I will address "industry standard of care" for snow and ice removal as it relates to U-Park, Inc., and the snow and ice removal services that were provided in relationship to the industry at large.

This report is not intended to be exhaustive in that a detailed examination of this property and all the information in this case has recently been initiated and this report should be considered to be subject to supplementation or future revisions if additional information becomes available.

EXHIBIT 6

## Qualifications:

I currently work full time in the snow and ice removal industry as a Certified Snow Professional, "CSP" with over 25 years of experience in the snow and ice removal industry. As of 2018, there were less than 225 CSP's in the US and Canada. To become a "CSP", I passed a three-hour exam that focused on: proficient knowledge of business, snow and ice science, sub-contractors, snow and ice operations, and techniques of the snow removal industry. I am actively involved with SIMA, the "Snow and Ice Management Association", which has the largest membership of snow and ice owners and contractors in the US and Canada. I have served on the SIMA "Advanced Contract Clauses" national committee in 2017, and have served on the national 2018 SIMA "Best Practices Committee", which focuses its efforts on setting national industry standards for snow and ice removal contractors all across the United States. I own Snowmen, Inc., which contracts with 500+ commercial properties in the average winter season. I have managed and overseen snow and ice operations on over 10,000 acres of parking lot pavement, and over 28,000,000 square feet of sidewalk walking area in my career.

I personally prepare over 1,500 snow and ice removal contracts per winter season, and I am an expert on snow and ice removal contract analysis and preparation. I have assisted hundreds of property managers and owners of commercial properties with setting the industry standard of care for snow and ice removal on their commercial properties, and I have overseen snow and ice removal operations at hundreds of commercial parking lots similar to U-Park over the last 25 years. I have examined thousands of asphalt and concrete commercial parking lots over the last 25 years to assess their condition, how they have been maintained, and how they need to be maintained to properly address their snow and ice removal needs. I am familiar with the snow and ice removal industry standard of care that is used at commercial asphalt parking lots in the industry today. Please note that the conclusions and opinions presented in this report are based on my education, experience, and the standards of practice for the snow and ice removal industry and represent valid conclusions and opinions to a reasonable degree of certainty. Additional experience and qualifications can be found in my CV, which is attached to this report.

## Observations, Authorities & Facts:

1. The weather report from the National Oceanic & Atmospheric Administration for February, 2016 in Omaha, NE shows that it snowed 4.9 inches on February 2, 2016. An additional .6 inches of snow precipitated in Omaha on February 5 and again on February 7. The weather record reflects that high temperatures were 37 degrees as a high on February 10, 2016.

2. U-Park, Inc. snow plows its parking lots in winter weather when over ½" of snow falls and puts down sand or ice melt to treat the lot anytime there is weather that requires it. (Defendant's Answers to Plaintiff's Interrogatories – Page 3, #6).

3. Joseph Schmidt operates U-Park and oversees the parking lot where the slip and fall incident occurred. He was responsible for the snow and ice removal at the parking lot in February of 2016. He states that when it snows, he plows the lots and begins plowing at ½" to ¾" of snow, and has the lot plowed and cleared by 6:00 AM, because that's when customers start showing up. He pushes the snow from west to east and uses Road Runner deicer for the parking lots. Exhibit 5 shows a picture of Road Runner deicer and the small, black, icy area where the slip and fall incident occurred. Joseph states that if there are freeze and thaw cycles, then he applies ice-melt if it's slippery, and he walks the parking lot on a regular basis in the winter months, visually inspecting and watching for dangers. (Joseph Schmidt deposition – pages 15, 71, 81, 83-84, 101, 102-103, 104, 117-118, 119-120, 122-123).

4. Tonia Ackerman states in her deposition that she remembers her parking spot was clear of ice and snow, and to get into the parking spot was clear. The area she drove in and the spot she parked in looked like normal pavement, and she did not see any snow or ice on the ground where she looked. She also states that prior to falling, she did not see any ice on the ground. (Tonia Ackerman deposition – pages 91, 116-117).

5. A series of photographs were taken after the slip and fall incident showing the condition of the U-Park, Inc. parking lot and the parking spot #153, where the slip and fall incident occurred. In the photo where there is a white Nissan car parked in parking space #153,

there is a small dark area to the rear left of the car facing the back of the car looking at it in the photo. The photos of the U-Park, Inc. parking lot area do not show any evidence of snow or ice in any of the parking lot spaces or parking lot area, except for this one small area in the back of parking spot #153. (Photos of slip and fall area 1-6).

6. A site visit was conducted by Jeremy Swenson on August 16, 2018 to examine the area of the slip and fall incident, and the drainage of the parking lot of the slip and fall area in relationship to the snow that had been plowed by the defendant, and placed on the perimeter of the property, as shown in the case photo, exhibit #5. The intention of the site visit was to focus on the slip and fall incident area, and the potential drainage issues that may have come from melting and refreezing of snow, and examine the slip and fall area for potential "bird baths" in the parking lot area where the slip and fall occurred. (Jeremy Swenson site visit – August 16, 2018).

## Opinions and Conclusions:

1. *The weather report from the National Oceanic & Atmospheric Administration for February, 2016 in Omaha, NE shows that it snowed 4.9 inches on February 2, 2016. An additional .6 inches of snow precipitated in Omaha on February 5 and again on February 7. The weather record reflects that high temperatures were 37 degrees as a high on February 10, 2016.* The weather report shows that there was snow earlier in the month of February of 2016, but the U-Park, Inc. snow removal policies and procedures were to remove all snow beginning at ½" of snow from the parking lot and apply deicer as needed. It is my opinion from reviewing the pictures of the parking lot that these services were provided and the parking lot was in excellent condition the afternoon of February 13, 2016, and all previous snow and ice had been removed and remediated as per industry standards. The last snowfall before the slip and fall incident occurred on February 7, 2016 and temperatures reached a high of 37 degrees on February 10th, three days later. U-Park, Inc. states that they would apply deicers as needed to treat the parking lot area anytime winter weather required it, and there is no evidence to suggest

that this is not the case. The slip and fall incident occurred 6 days after .6 inches of snow fell in the U-Park, Inc. parking lot.

2. *U-Park, Inc. snow plows its parking lots in winter weather when over ½" of snow falls and puts down sand or ice melt to treat the lot anytime there is weather that requires it. (Defendant's Answers to Plaintiff's Interrogatories – Page 3, #6).* The U-Park, Inc. parking lot is not categorized as a "high profile" commercial parking lot in the snow and ice removal industry today. It would be considered a standard or best practice for a commercial parking lot like the U-Park, Inc. to have a 1" trigger depth to start removing snow from the parking lot. In my experience of dealing with thousands of high-profile snow and ice removal properties, I have found that less than 1% of all snow removal contracts in my career have chosen to have a ½" trigger depth for parking lot snow removal. Usually these properties are hospitals that are open 24 hours per day 7 days a week, airports, or similar type properties. The properties that choose to utilize a ½" trigger depth for snow plowing services are owned and operated by individuals who are very concerned about the safety of their employees and customers, and are willing to provide an extra high level of snow and ice removal service. This is what the U-Park, Inc. has chosen for its employees and customers, and it is evident in the pictures that are provided with the case. Every parking spot and area of the parking lot is 100% free of snow and ice. There are some areas in exhibit 5 where snow pushed up neatly into a pile, but there are no "trails" where there has been melting and refreezing of snow dripping and trailing across the parking lot as would be in other parking lots that were poorly maintained. Photo exhibit #5 shows a perfectly clear parking lot in every area. It is my opinion that based on the ½" snow plowing trigger depth that the U-Park properly executed its snow and ice removal duties and responsibilities as per industry standards. It is also my opinion that based on the photos provided with the case that the U-Park, Inc. properly executed inspections of the parking lot for melting, refreezing, and black ice as per current industry standards.

3. *Joseph Schmidt operates U-Park and oversees the parking lot where the slip and fall incident occurred. He was responsible for the snow and ice removal at the parking lot in*

*February of 2016. He states that when it snows, he plows the lots and begins plowing at ½" to ¾" of snow, and has the lot plowed and cleared by 6:00 AM, because that's when customers start showing up. He pushes the snow from west to east and uses Road Runner deicer for the parking lots. Exhibit 5 shows a picture of Road Runner deicer and the small, black, icy area where the slip and fall incident occurred. Joseph states that if there are freeze and thaw cycles then he applies ice-melt if it's slippery, and he walks the parking lot on a regular basis in the winter months, visually inspecting and watching for dangers. (Joseph Schmidt deposition – pages 15, 71, 81, 83-84, 101, 102-103, 104, 117-118, 119-120, 122-123).* Joseph Schmidt manages and oversees the U-Park parking lot where the slip and fall incident occurred. He was responsible for the snow and ice removal services and the parking lot in February of 2016. He states that when it snows he starts plowing the lot at ½" to ¾" of snow, and he has the lot plowed and cleared by 6:00 AM. He uses Road Runner deicer on the parking lot, and if there are freezing and thawing cycles he comes to the parking lot and applies ice-melt if it's slippery. He states that he visits the parking lot daily in the winter months, and is inspecting the lot for hazards, and addressing them as needed. It is above industry standard to begin plowing a parking lot like the U-Park lot at ½" to ¾" of snow. It would be standard in the industry for a medical property to have a 1" trigger to start plowing snow. The defendant also uses Road Runner ice-melt, which is comprised of magnesium chloride, to deice the parking lot area. It is above industry standard to deice parking lot areas with magnesium chloride. It is industry standard to deice a parking lot at a high-profile medical property with road rock salt. Magnesium chloride is much more expensive to use, and it melts snow and ice down to -25 degrees. It is considered a premium deicer in the snow and ice removal industry. It is my opinion that U-Park, Inc. exceeded the industry standard of care in regard to their snow plowing and deicing practices at the U-Park parking lot in February of 2016. It is industry standard to have a reasonable inspection program in place for melting and refreezing of snow, and Joseph Smith states that he would monitor the weather, visit the parking lot to inspect for melting and refreezing, and deice slippery areas as needed. There is no evidence of any melting and refreezing from snow piles in the case file photographs. It is my opinion that U-Park, Inc. complied with their snow and ice removal duties and the industry standard of care in regards to inspecting and

deicing the melting and refreezing of water resulting from plowed snow piles, as there is no evidence of melted and refrozen water in exhibit 5, or other photographs taken the day of the slip and fall incident.

4. *Tonia Ackerman states in her deposition that she remembers her parking spot was clear of ice and snow, and to get into the parking spot was clear. The area she drove in and the spot she parked in looked like normal pavement, and she did not see any snow or ice on the ground where she looked. She also states that prior to falling, she did not see any ice on the ground. (Tonia Ackerman deposition – pages 91, 116-117).* Tonia Ackerman states in her deposition that she did not see any snow or ice in the parking lot or parking spaces when she was in the U-Park parking lot the day of the slip and fall incident. She states that she does not remember seeing the black spot on the ground before she slipped and fell. It is my opinion based on Tonia Ackerman's statements, case files, and photographs provided in the case that more likely than not the U-Park parking lot and parking spaces were free from snow and ice, and the strange black spot at the back of parking space 153 was not a result of improper snow and ice removal duties provided by U-Park, Inc.

5. *A series of photographs were taken after the slip and fall incident showing the condition of the U-Park, Inc. parking lot and the parking spot #153, where the slip and fall incident occurred. In the photo where there is a white Nissan car parked in parking space #153 there is a small dark area to the rear left of the car facing the back of the car looking at it in the photo. The photos of the U-Park, Inc. parking lot area do not show any evidence of snow or ice in any of the parking lot spaces or parking lot area, except for this one small area in the back of parking spot #153. (Photos of slip and fall area 1-6).* The photographs taken after the slip and fall incident show the parking lot of the U-Park, Inc. I have examined hundreds of photographs of parking lots in my 25 years of snow and ice removal experience, and my first impression of these photos were that I was surprised at how clear the parking lot was of ice and snow. Usually when I look at photos there is ice and snow all over the photos, but in these photos, the only small patch of possible black ice I can find is in the back of parking space #153. The temperatures were below freezing the afternoon of February 13, 2016 and I have seen situations in my experience

like the black ice patch in the back of space #153. In my experience it is my opinion that either one of two things have happened. #1 - A car or truck pulled into the parking space and sat idling for a period of time and then after it shut off there was moisture or condensation that leaked out of the tailpipe onto the ground and froze into a patch of black ice. #2 – A person walking through the parking lot dumped a bottle of water out on the ground and the water froze on the parking lot into black ice. After examining the pictures provided very closely, it is my opinion that the small black ice area is not related in any way to the snow that fell the previous 6 days earlier. If it was related to melting and refreezing then there would be a "trail" of frozen water that would be leading from the fenced area, or from the visible snow pile up in the upper left corner. It is my opinion that the small black ice area in the photo is a strange black ice patch that is not related in any way to the snow or ice removal duties or responsibilities of U-Park, Inc. It is not considered standard in the industry today for building owners or property managers to have to "monitor" or "inspect" for small black ice patches that are not created by snow or ice from weather events.

6. Philip Wayne's CV states that he has been concentrating in the area of property management for his career, and his areas of competency include: "Premise Liability, Fair Housing, Maintenance and Repair, Ice and Snow Issues, Crime Prevention & Security, Tenant/Staff Supervision, and Mentoring. Fire & Smoke Detector issues, Scalding, Landlord/Tenant Law & Regulations. Agency, Contracts with Owners and/or Vendors and Business Operations. Project Feasibility, Development & Rehab, as well as Marketing & Leasing.". (Philip Wayne CV). Philip Wayne has a lot of experience in property management, and a list of other issues that all revolve around actions that property managers experience in their career. Property managers hire professional snow and ice removal contractors to provide expert snow and ice removal services for their properties because they are not experts in snow and ice. Philip Wayne is not a snow and ice expert. I have been working with hundreds of property managers and building owners every year for years. I administer snow and ice training sessions for property management companies like the one Philip Wayne used to oversee and work for, and I advise, train, and set up the standard of care for their high-profile commercial properties.

I am considered an expert in snow and ice removal by my peers and am asked to serve and speak nationally on snow and ice related issues to help further the snow and ice removal industry in the United States and Canada.

7. *Philip Wayne's expert report, dated June 9, 2018, expressed opinions regarding the case. Opinions summarized in his report are: "**Opinion #1. That the defendant either created the condition, knew of the condition, or by the exercise of reasonable care, would have discovered the condition.**". He goes on to state that the defendant was very familiar with the parking lot, did not have any interest in maintaining the parking lot, and it was not maintained properly. "**Opinion #2. That the defendant should have realized that the condition involved an unreasonable risk of harm to lawful entrants on the premises.**" He goes on to state that the condition of the lot was poor, and there was a "birdbath" area that could fill up with water and freeze. "**Opinion #3. That the defendant should have expected a lawful entrant, such as the plaintiff, either: a. Would not discover or realize the danger; or b. Would fail to protect himself against the danger**". Philip states that Mr. Schmitt was intimately familiar with every aspect of the lot and the hazards, but patrons did not. "**Opinion #4. That the defendant failed to use reasonable care to protect lawful entrants against the danger.**". Mr. Wayne mentions in his report "**Foreseeability:**" and then goes on to quote from the Institute Real Estate Management (IREM) Code of Ethics which states in Article 8: "**Managing the Assets of the Client, that: A (Property Manager) shall exercise due diligence in the maintenance and management of the client's assets and shall make all reasonable efforts to protect it against all reasonably foreseeable contingencies and losses.**" Mr. Wayne finishes his report by stating that it is opinion that there existed a duty to provide a reasonably safe environment to its patrons, and that the defendant breached that duty. He goes on to opine that the defendant's conduct was below the duty or standard of care by not inspecting and correcting drainage flow to pedestrian walkways. (Philip Wayne website – Forensic Expert Witness – CV pages, Philip Wayne expert report dated June 9, 2018).* I disagree with all of Philip Wayne's opinions in his expert report. The first four opinions have to do with the defendant not maintaining the parking lot properly, and stating that the defendant should have known that a dangerous condition existed and

didn't do anything about it. When I visited the parking lot August 16, 2018, I did drive around the parking lot and look at the overall condition of the parking lot. I have surveyed thousands of asphalt parking lots in my snow and ice removal career, and it is my opinion that the U-Park lot is in "average" to "above-average" condition for an asphalt parking lot. I have seen asphalt lots in much worse condition, and I have seen newer asphalt lots as well. I was interested in the parking lot area where the slip and fall incident occurred. The area of the parking lot where the slip and fall incident occurred was not in poor condition, and it is my opinion based on examining thousands of asphalt parking lots for melting, refreezing, and slick conditions that the "condition" or "maintenance" of the U-Park asphalt lot in the area where the slip and fall occurred did not contribute to the slip and fall incident of Tonia Ackerman. Mr. Wayne states that the defendant should have expected a lawful entrant, such as the plaintiff, either: a. Would not discover or realize the danger, or b. Would fail to protect himself against the danger". It is standard in the industry to inspect plowed snow piles in parking lots for melting, refreezing of snow, and deice as needed, which U-Park, Inc. had in place. It is not reasonable or standard in the industry to expect building owners or property managers to inspect parking lots 6 days after a snow event multiple times per day for strange, possible icy spots that could occur from a spilled water bottle or some other type of incident not caused by melting snow. It is my opinion that U-Park, Inc. was very reasonable in the performance of their snow and ice removal duties in February of 2016, and it is considered very reasonable and above industry standard to have the parking lot and parking spaces clear of snow and ice 6 days after a snow or ice event. It is my opinion that if a parking lot and parking spaces are free of snow and ice at that point it becomes the responsibility of the person walking to make sure they do not step on a ball point pen, rock, plastic lid, or strange small patch of black ice. Mr. Wayne talks about "Foreseeability" and then goes on to quote from the IREM code of ethics. I am a member of the Institute of Real Estate Management and have been for over a decade. I work with many property managers and building owners who are members of IREM, and I am familiar with the standard of care that IREM members expect for snow and ice removal. It is industry standard in IREM, the Institute of Real Estate Management that if a parking lot area is free of snow and ice 6 days after a snow or ice winter storm then the

duties of the snow and ice removal provider have been met. It is my opinion that U-Park, Inc. met the standard of care as per IREM snow and ice removal standards, and exercised reasonable care in the maintenance and management of the parking lot. Mr. Wayne states he believes U-Park, Inc. did not provide a "reasonably safe environment for its patrons" and they breached the standard duty of care by not correcting the drainage flow of the parking lot. It is standard in the industry that if an area of a parking lot where a slip and fall occurred has no noticeable snow or ice in parking spaces or in the parking lot area, this is considered "reasonably safe". It is my opinion that U-Park, Inc, was reasonable in their standard duty of care for the parking lot.

8. *A site visit was conducted by Jeremy Swenson on August 16, 2018 to examine the area of the slip and fall incident, and the drainage of the parking lot of the slip and fall area in relationship to the snow that had been plowed by the defendant, and placed on the perimeter of the property, as shown in the case photo, exhibit #5. The intention of the site visit was to focus on the slip and fall incident area, and the potential drainage issues that may have come from melting and refreezing of snow, and to examine the slip and fall area for potential "bird baths" in the parking lot area where the slip and fall occurred. (Jeremy Swenson site visit – August 16, 2018).* Picture attachments #1 and #2 show two of the main areas in relation to the slip and fall incident where the defendant states that the snow was pushed when snow plowing the U-Park, Inc. parking lot in the winter months. The snow (as shown in the photo in exhibit 5), was pushed to the grassy areas of the edge of the parking lot, and the snow melted and drained towards the fence as shown in Picture attachment #1 and Picture attachment #2.



Picture Attachment #1

Snow pushed to this grass area, main melting and refreezing of snow draining to back of the fenced area



Picture Attachment #2

Snow pushed to this grass area - main melting and refreezing of snow draining to back of the fenced area

It is standard in the industry that parking lots have slope to drain water away, and I examined this at the U-Park, Inc. lot in relation to the slip and fall area. Picture attachments #3 and #4 show with green arrows the direction the water would flow if there was rain, or if there was melting and refreezing of water from snow piled on the perimeter of the property. When on-site it was visible where there were discolorations in the areas where the green arrows are in the pictures, indicating previous water flow after a rain.



Drainage slope of parking lot - as indicated by shading/discoloration in the asphalt parking lot surface.

Picture Attachment #3



Mr. Wayne states in his report that from his site visit he believes there is a "birdbath" behind parking space #153. I disagree with his conclusion. I do agree that there is a water drainage path that runs towards and through this area, but in my opinion it is the path of a normal drainage area in the parking lot, and not the result of the defendant's poor parking lot maintenance. I have seen hundreds of "birdbaths" in parking lot areas and have included a picture of what they look like in parking lots. They include deep depressions in asphalt that are usually round or oval shaped, holding water for many days in parking lots, hence the name "birdbath".



Melting and refreezing of snow is very easy to spot in a parking lot 6 days after a winter storm because the majority of the parking is usually bare pavement, but the area where snow has melted is very obvious because there are black marks or streaks that have leaked out or run across the parking lot, and then the water running across this area refreezes when temperatures drop below freezing, creating slick conditions. I have included Picture attachment #5, which shows an example of what melting and refreezing of snow looks like coming from a pile of snow. There is no evidence of any melting and refreezing from snow piles of the U-Park, Inc. parking lot the day of the slip and fall incident. It is my opinion that U-Park, Inc. had successfully inspected and remediated any threat from melting and refreezing of snow from snow piles on February 13, 2016.



This is an example of what melting of water and refreezing from a plowed snow pile looks like, and there is no evidence of water melting, refreezing and draining to low spots in the photograph in Exhibit 5, which shows the small, black patch where the Plaintiff slipped and fell.

Picture Attachment #5

9. After reviewing the initial case files, weather records, and photos provided it is my opinion that Tonia Ackerman may have slipped on a strange black ice patch shown in a photo at the back of parking space #153. It is my opinion that this strange black ice patch was not created by snow or ice conditions related to the snow that fell in Omaha, NE, in February of 2016. It is my opinion that U-Park, Inc. had very aggressive snow and ice

removal policies and procedures in place and was operating above current industry standards removing snow from their parking lot at ½", and deicing whenever needed. After reviewing the case files and parking lot photos, it is my opinion that U-Park, Inc. was not negligent, and they did use reasonable care in their snow and ice removal duties in removing snow and ice in their parking lot area in February of 2016.

I hereby certify that I have no interest, financial or otherwise, in the outcome of this matter. I reserve the right to revise these conclusions and opinions if additional relevant information is provided.

Submitted August 30, 2018

Jeremy E. Swenson, CSP

## Materials Reviewed:

1. National Oceanic & Atmospheric Administration Weather for Omaha – February 2016.
2. Complaint.
3. Answer.
4. Plaintiffs Supp ATI 2.15.18.
5. Plaintiffs Answers to Interrogatories 1.26.18.
6. Plaintiffs message/recording about accident.
7. Photos of area where incident occurred - 6 photos.
8. Defendants RRFP 2.9.18.
9. Defendants ATI 2.9.18.
10. City of Omaha Fire and Rescue Report dated 2/13/2016.
11. Tonia Ackerman Deposition and exhibits.
12. Dennis Ackerman Deposition and exhibits.
13. Joseph Schmitt Deposition and exhibits.
14. Swenson Letter 7.10.18 Plaintiff's expert report.
15. Philip B. Wayne Expert Report, CV and Site Photos.
16. SitePhoto1-4.

## Attachments:

1. Attached and made a part of this report are my current Curriculum Vitae.
2. Information regarding my Certified Snow Professional "CSP" designation from the Snow and Ice Management Association, "SIMA".