IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| TONIA ACKERMAN and DENNIS ACKERMAN, | |
|---|---|
| Plaintiffs, | 8:17CV209 |
| v. | MEMORANDUM AND ORDER |
| U-PARK, INC., | |
| Defendant. | |

Pending before the Court are defendant U-Park, Inc.'s ("U-Park") "*Daubert* Motion in Limine and Request for Hearing" (Filing No. 54) and Motion for Summary Judgment (Filing No. 51). Plaintiffs Tonia Ackerman ("Ackerman") and Dennis Ackerman (collectively, the "Ackermans") oppose and request hearings on both motions. For the reasons stated below, both motions will be granted without a hearing.

### I.   BACKGROUND[1]

U-Park owns several parking lots in Omaha, Nebraska, and leased the parking lot at issue in this case ("Lot 13"). Joseph Schmitt ("Schmitt"), part-owner of U-Park, was collecting parking fees at Lot 13 on February 13, 2016, when Ackerman parked her vehicle there to attend a nearby event. Ackerman alleges that as she walked away from her car, she "slipped and fell on a patch of black ice she was unable to see because it blended into the blacktop" on Lot 13.

Lot 13 is surfaced with asphalt. Though the parties dispute whether U-Park or Lot 13's owner bears responsibility for the asphalt's condition, the parties agree U-Park

---

[1]On a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, the Court views the record in the light most favorable to the party resisting the motion. *State Auto. Ins. Co. v. Lawrence*, 358 F.3d 982, 985 (8th Cir. 2004).

was responsible for snow and ice removal on Lot 13 and that Schmitt personally repaired the asphalt on three prior occasions. Schmitt also did most of the snow and ice removal for Lot 13. He testified that he would check Lot 13 "just about every day," admittedly primarily to ensure patrons paid parking fees but also to inspect Lot 13's condition. Though Schmitt typically conducts that inspection in the morning, Schmitt could not "specifically say" that he examined Lot 13 on the morning of February 13, 2016.

No precipitation occurred in Omaha in the six days before February 13, 2016. Schmitt and Ackerman both confirmed the lack of precipitation and testified that day was very cold. Schmitt recollected Lot 13 was clear that day. Despite that, Ackerman states she fell on an ice patch in parking-stall number 153 ("Stall 153"). No one witnessed Ackerman's fall, and she did not see any snow or ice prior to her fall, instead recalling that the ground looked like normal pavement. Ackerman asserts she slipped on "black ice," which the parties define as ice that you "can't see." Schmitt testified that he was unaware of ice in Stall 153 prior to Ackerman's fall. After Ackerman's fall, Schmitt took photographs (Exhibits 5 and 6) of Stall 153 and spread ice melt there. Neither party claims to know precisely how the ice originated, with theories ranging from patrons dumping water bottles to vehicles dripping slush.

To help her answer that question, Ackerman retained Philip B. Wayne ("Wayne") of Philip B. Wayne Consultants, LLC. According to Wayne's deposition (Filing No. 57-3), report (Filing No. 57-3), and curriculum vitae (Filing No. 61-6), Wayne has previously testified as an expert and his career has concentrated in property management. He reports he refers to himself as a "forensic expert" because attorneys "frequently" refer to him as one and it "sounds pretty good." His report advises that he has "personally performed or supervised the regular inspection, maintenance, and repair including snow and ice removal/abatement on commercial parking lots that included within pedestrian walkways and drives."

2

Presently, Wayne offers consulting, training, and expert-witness services under the "wide umbrella of property management." Wayne has a bachelor's degree in business administration with a concentration in economics. He served as an adjunct professor at the University of Nebraska-Omaha teaching topics related to property management. Wayne has never taught a class specifically on accident-risk assessment or abatement, but some of his courses had sections on avoiding lawsuits which included slips-and-falls. Though Wayne boasts publications on property-management topics, none focus on accident-risk assessment or abatement beyond including slips-and-falls in "a general heading" in lists of "items in which the propensity for landlords to be sued for poor actions is followed"— whatever that means.

Wayne has managed numerous properties. Though he performed hands-on snow removal at those properties from "'69 to '74-'77," since that time, his involvement has been limited to supervising others or hiring contractors. In addition to property management, for a little over ten years, Wayne worked as a police academy instructor and taught "classes for landlords under the auspices of the police department" training the crime-control aspect of property management. Wayne has never owned or operated a snow-removal company.

Wayne visited Lot 13 for the first time on March 8, 2018, over two years after Ackerman's fall. It is undisputed that the extent of Wayne's testing at Lot 13 was to "simply take a volleyball and roll it" and to observe "asphalt staining patterns." Wayne also testified he drove through Lot 13 shortly after a rain shower and saw water pooling in "birdbaths" around where Ackerman fell. Wayne defines a birdbath as "[a]ny depression where water is held." On May 17, 2018, Wayne took photographs of Lot 13 but did not take any pictures of Stall 153. Other than the photographs taken by Schmitt, Wayne viewed no photographic evidence of Lot 13's condition at the time of Ackerman's fall.

Based on his volleyball roll and observations, Wayne concluded (1) there was "virtually a complete lack of maintenance in [Lot 13's] surface," (2) a birdbath existed in Stall 153 (and based on "the asphalt discoloration observed, this condition existed long before [Ackerman's fall]"), (3) Lot 13's natural drainage path would allow for ice and snow to melt and drain towards the birdbath in Stall 153, and (4) black ice formed in the birdbath causing Ackerman's fall. Wayne posits, among other things, that an underground cable possibly caused the birdbath and opines that U-Park should have known not only about the birdbath's existence, but also its potential to accumulate water and freeze.

## II. DISCUSSION

### A. Motion in Limine

To effectively rule on U-Park's Motion for Summary Judgment, the Court must first consider U-Park's motion to exclude Wayne's testimony as "irrelevant, unfounded in fact, and speculative," made pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell-Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The Ackermans argue "Wayne's opinions are relevant, reliable, and will assist the jury in fact determinations." At this stage, the Court will consider Wayne's challenged testimony only as it is relevant to the Motion for Summary Judgment.

#### 1. Standard

Federal law governs the admissibility of expert testimony in this diversity action.[2] *See* 28 U.S.C. § 1332(a); *Urein v. Timesavers, Inc.*, 394 F.3d 1008, 1011 (8th Cir. 2005). The Ackermans bear the burden of showing admissibility by a preponderance of the evidence. *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). Rule 702 instructs:

---

[2]The Ackermans are Iowa citizens, U-Park is a Nebraska citizen, and the amount in controversy exceeds $75,000.

4

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

The Court is charged by *Daubert*, 509 U.S. at 597, to act as a gatekeeper to determine both whether Wayne is qualified to give expert testimony on the subjects identified and whether his testimony is relevant and reliable.

First, the Court must decide whether Wayne is qualified to offer expert testimony about his theorized birdbath and resultant black ice. *See Sylla-Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d 277, 283 (8th Cir. 1995). The central question "is whether [Wayne's] knowledge of the subject matter is such that his opinion will most likely assist the trier of fact in arriving at the truth." *Williams v. Pro-Tec, Inc.*, 908 F.2d 345, 348 (8th Cir. 1990) (quoting *Holmgren v. Massey-Ferguson, Inc.*, 516 F.2d 856, 857-58 (8th Cir. 1975)). An individual can qualify as an expert despite lacking academic qualifications, "where he possesses sufficient knowledge gained from practical experience." *Fox v. Dannenberg*, 906 F.2d 1253, 1256 (8th Cir. 1990). That experience, however, "must bear a close relationship to the expert's opinion." *Schmidt v. City of Bella Villa*, 557 F.3d 564, 571 (8th Cir. 2009).

The Court next must decide whether Wayne's testimony is relevant and reliable. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152-53 (1999). In *Daubert*, 509 U.S. at 593-94, the Supreme Court identified several nonexclusive factors to inform this analysis, such as whether Wayne's theories or techniques: (1) can be and have been tested;

(2) have been subjected to peer review and publication; (3) have a known or potential rate of error; and (4) have been generally accepted. This inquiry may also "focus upon personal knowledge or experience." *Kumho*, 526 U.S. at 151. Wayne's testimony should only be excluded if it "is so fundamentally unsupported that it can offer no assistance to the jury." *First Union Nat'l Bank v. Benham*, 423 F.3d 855, 862 (8th Cir. 2005) (quoting *Bonner v. ISP Tech., Inc.*, 70 F.3d 968, 974 (8th Cir. 1995)).

### 2. Analysis

Most germane to U-Park's Motion for Summary Judgment, the Ackermans have failed to demonstrate that Wayne is qualified to offer expert testimony in this case on his theory that a birdbath resulted in black ice. Due to his lack of relevant academic qualifications, Wayne relies upon practical experience to attempt to qualify as an expert. The Ackermans have not established that Wayne's practical experience "bear[s] a close relationship to [his] opinion" that a birdbath existed in Stall 153 two years prior to his inspection. *Schmidt*, 557 F.3d at 571.

On the record before the Court, Wayne "sorely lack[s] the education, employment, or other practical personal experience to testify as an expert specifically regarding" the deterioration of asphalt and the creation of birdbaths. *See Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001) (concluding a hydrologist specialized in flood management was not qualified to testify about warehouse practices); *see also Garnac Grain Co. v. Blackley*, 932 F.2d 1563, 1566 (8th Cir. 1991) (finding that an individual who worked in a company's accounting department may have had specialized knowledge of that company's operations but not of general auditing or accounting standards). While the record demonstrates Wayne's property-management background, the Ackermans have failed to explain how experience with managing properties that happen to have parking lots surfaced with asphalt makes him an expert about asphalt, its geological properties, and the rate at which it deteriorates.

Asphalt erosion does not readily fall under the "wide umbrella of property management." Otherwise, any property owner or manager who maintained a component of their property could proclaim expertise in that area's disintegration.³ Accordingly, the Court finds Wayne's opinion would not "assist the trier of fact in arriving at the truth." *Williams*, 908 F.2d at 348 (quoting *Holmgren*, 516 F.2d at 857-58).

The Ackermans have also failed to meet their burden in showing Wayne's testimony is relevant and reliable. It is not disputed that the extent of Wayne's testing was to observe asphalt stains, roll a volleyball, and drive through Lot 13 following a rain shower over two years after the fact. Wayne also concedes to "conjecturing the whole thing" in terms of the origin of the water that he theorized froze in a birdbath in Stall 153. Wayne did not examine Stall 153 until more than two years *after* Ackerman's fall. Even then, he did not take any photographs or otherwise document his inspection of Stall 153. Wayne admitted he could not testify a birdbath existed in Stall 153 when Ackerman fell from personal observation, yet he asserted he could conclude "this [birdbath] existed long before [Ackerman's fall]," because in his opinion:

> Asphalt tells stories whether it be staining due to water flows—and birdbaths are particularly telling. And these conditions don't happen overnight. It takes years. So, I can look a lot and read these stains, see these birdbaths, take a look at the alligatoring and other aspects of asphalt damage and have a pretty good idea of the fact that if an incident occurred, especially within the past two years, they were certainly there prior to that and probably several years prior to that.

The Ackermans have offered no support for Wayne's theory that he can tell how long a birdbath has existed by reading the stains of asphalt like the rings of a tree. Nor have the Ackermans shown Wayne's methodology otherwise meets muster under *Daubert*.

---

³Wayne may have expertise in property-management procedures, such as maintaining safety logs. But the Court is only considering Wayne's qualifications as they pertain to U-Park's Motion for Summary Judgment, specifically, his opinion that a birdbath existed in Stall 153 at the time of Ackerman's fall resulting in black ice.

Simply put, the Ackermans have failed to establish that Wayne's opinion is "supported by the kind of scientific theory, practical knowledge and experience, or empirical research and testing that permit assessment 'of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" *Robertson v. Norton Co.*, 148 F.3d 905, 907 (8th Cir. 1998) (quoting *Daubert*, 509 U.S. at 592-93). Accordingly, his testimony must be excluded.

### B. Motion for Summary Judgment
#### 1. Standard of Review

U-Park further moves for summary judgment pursuant to Federal Rule of Civil Procedure 56. Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

The Court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment." *Id.*

The movant bears the initial burden of showing "the basis for its motion and must identify the portions of the record that it believes demonstrate the absence of a genuine dispute of material fact." *Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018). "[T]his initial burden . . . is 'far from stringent' and 'regularly discharged with ease.'" *Id.* (quoting

8

*St. Jude Med., Inc. v. Lifecare Int'l, Inc.*, 250 F.3d 587, 596 (8th Cir. 2001)). The nonmovant must then "'respond by submitting evidentiary materials' of specific facts showing the presence of a genuine issue for trial." *Id.* (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc)).

The Court views the record in the light most favorable to the nonmovant. *Lawrence*, 358 F.3d at 985. But "[i]f the party with the burden of proof at trial is unable to present evidence to establish an essential element of that party's claim, summary judgment on the claim is appropriate because 'a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *St. Jude Med.*, 250 F.3d at 595 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

2. **Analysis**

Neither party disputes that Nebraska law governs this diversity action. *See Emp'r Reins. Co. v. Mass. Mut. Life Ins. Co.*, 654 F.3d 732, 789 (8th Cir. 2011). Under Nebraska law, U-Park may be liable for the Ackermans' injuries resulting from a condition on Lot 13 if the Ackermans prove:

> (1) that [U-Park] either created the condition, knew of the condition, or by exercise of reasonable care would have discovered the condition (should have known); (2) that [U-Park] should have realized the condition involved an unreasonable risk of harm to [Ackerman]; (3) that [U-Park] should have expected that [Ackerman] either would not discover or realize the danger or would fail to protect . . . herself against the danger; (4) that [U-Park] failed to use reasonable care to protect [Ackerman] against the danger; and (5) that the condition was a proximate cause of damage to [Ackerman].

*Edwards v. Hy-Vee, Inc.*, 883 N.W.2d 40, 43 (Neb. 2016).

The Ackermans contend the conditions resulting in their injuries were a birdbath and "resultant black ice that would not have existed but for [the birdbath]." Before considering whether U-Park created, knew of, or should have known of a birdbath or resultant black ice, "the evidence must at least create a reasonable inference that [those

9

conditions] did in fact exist." *Range v. Abbott Sports Complex*, 691 N.W.2d 525, 530 (Neb. 2005). In *Range*, the Nebraska Supreme Court concluded that the evidence created a reasonable inference that a hole existed on a soccer field prior to the beginning of a match where the player attested to seeing the hole immediately after he fell and no dirt surrounded the hole suggesting that it had been recently dug by an animal. *Id.*

Here, the Ackermans are entitled to a similar inference that ice was present at the location of Ackerman's fall—which both Ackerman and Schmitt saw afterward, prompting Schmitt to spread ice melt. But that evidence fails to create a reasonable inference that a birdbath existed. Unlike in *Range*, in this case, neither the Ackermans nor U-Park claimed to see a birdbath in Stall 153 immediately after Ackerman fell. Instead, the only evidence that a birdbath ever existed in Stall 153 comes from Wayne's excluded testimony.[4] Even if Wayne's testimony was admitted, his assertion that a birdbath existed at the time Ackerman fell based on his observations two years after her fall is far too speculative to reasonably infer a birdbath existed. *Edwards*, 883 N.W.2d at 44 ("Inferences based upon guess or speculation do not create material issues of fact for purposes of a summary judgment."); *accord Bloom v. Metro Heart Group of St. Louis, Inc.*, 440 F.3d 1025, 1028 (8th Cir. 2006) (finding speculation and conjecture insufficient to defeat summary judgment). Accordingly, the Court will not consider a birdbath as a condition for liability.

### a. Creation

U-Park could be liable if it created the black ice which allegedly injured the Ackermans. "The key to potential liability . . . [is] *active involvement* of [U-Park] in creating the dangerous condition." *Edwards*, 883 N.W.2d at 44 (emphasis added).

---

[4]Notably, the Ackermans asserted as an undisputed fact that a birdbath existed in Stall 153 and it would have existed for years. U-Park failed to properly respond to the Ackermans' statements of undisputed facts as required by NECivR 56.1(b)(1). But because the Court excluded Wayne's testimony, many of the Ackermans' relevant assertions are not supported by "'evidentiary materials' of specific facts," *Bedford*, 880 F.3d at 996 (quoting *Torgerson*, 643 F.3d at 1042), to comply with federal and local rules, *see* Fed. R. Civ. P. 56; NECivR 56.1.

It is undisputed that neither party knows the source of the water which formed into the black ice in Stall 153. None of the parties' theories—such as patrons dumping water bottles—suggest that U-Park was actively involved in placing water in Stall 153 to create the black ice.[5] As such, liability may not be imposed on U-Park for creating that condition.[6] *See id.*; *see also Derr v. Columbus Conv. Ctr., Inc.*, 604 N.W.2d 414, 417 (Neb. 2000) (concluding liability could not be imposed where "there [was] no evidence to suggest, nor [did] [the plaintiff] argue, that [the owner's] employees were actively involved in spilling the ice on which [the plaintiff] fell").

### b. Actual Knowledge

U-Park could also be liable if it actually knew black ice existed in Stall 153 prior to her fall. *See Richardson v. Ames Ave. Corp.*, 525 N.W.2d 212, 216 (Neb. 1995). The Ackermans concede, though, that "[n]o agent of U-Park, including Schmitt, discovered the ice spot prior to [Ackerman's] fall."[7] Liability may not be imposed based on actual knowledge.

---

[5]To argue U-Park created the black ice, the Ackermans point to Wayne's opinion that it is possible a snow pile in Lot 13 melted and drained into a birdbath in Stall 153, accumulating into black ice. The Court excluded Wayne's testimony on this issue, and it cannot serve as evidence that U-Park created black ice. But even if the Court admitted Wayne's testimony, his theory of the water's origin is admittedly conjecture and he has conceded that the photographs taken the day of Ackerman's fall do not show surface ice leading from a snow pile to Stall 153.

[6]Ackerman admitted that, "[o]ther than an expert witness" she was not aware of "any witness, any information, any evidence whatsoever that supports a conclusion that [U-Park] contributed to the creation of the defect that caused [her] fall."

[7]Confusingly, despite this concession, the Ackermans disputed U-Park's statement that it only learned of the ice after Ackerman's fall. Considering that the Ackermans simply wrote "Disputed Schmitt only knew of the ice after the fall," without citing to supporting evidence as required by the federal and local rules, *see* Fed. R. Civ. P. 56, NECivR 56.1, and then themselves asserted that U-Park did not discover the ice until after Ackerman's fall, the Court considers the fact that U-Park had no actual knowledge of the ice undisputed.

### c. Constructive Knowledge

U-Park may also be liable if it *should* have known that black ice existed in Stall 153 prior to Ackerman's fall, that is, if it had constructive notice of the black ice. To have constructive notice, the black ice "must [have been] visible and apparent and it must [have] exist[ed] for a sufficient length of time prior to [Ackerman's fall] to permit [U-Park] to discover and remedy it." *Range*, 691 N.W.2d at 529.

The facts in this case are similar to those in *Cloonan v. Food-4-Less of 30th & Weber, Inc.*, 529 N.W.2d 759, 763 (Neb. 1995). In that case, a patron allegedly fell due to ice on a store's sidewalk. *Id.* Because the patron testified that the sidewalk looked "okay" before she fell, the Nebraska Supreme Court found she "failed to adduce any evidence that any alleged dangerous condition of [the store's] sidewalk, whether caused by ice or some other slippery substance, was visible or apparent." *Id.* With that, the Nebraska Supreme Court held that patron did not show the store had constructive notice of ice because the store's employees "[were] not required to see what cannot be seen by other human beings." *Id.*

Like in *Cloonan*, no evidence exists in this case that U-Park should have known of black ice in Stall 153 prior to Ackerman's fall. No genuine dispute of material fact exists about whether the black ice was visible and apparent. Both parties agree that black ice means ice that you "can't see"—that is, ice which is not visible and apparent. U-Park's employees are not expected "to see what cannot be seen by other human beings." *Id.* at 763.

The Ackermans nonetheless argue U-Park should have known ice would accumulate in Stall 153.[8] Even assuming U-Park could be liable for a condition which was not visible and apparent, the Ackermans have offered no evidence that U-Park should have

---

[8]This argument depends on Wayne's conclusion that a birdbath existed in Stall 153 prior to Ackerman's fall and accumulated black ice, but the Court will entertain it.

known black ice would form in Stall 153, such as a history of black ice forming there in the past. *See*, *e.g.*, *Burns v. Veterans of Foreign Wars*, 438 N.W.2d 485, 490 (Neb. 1989) (finding possible liability where ice was visible *and* where ice had formed in the area of the plaintiff's fall in the past); *Maxwell v. Lewis*, 186 N.W.2d 119 (finding possible liability where the defendant had a history of ice problems and had observed water dripping throughout the day until temperatures dropped below freezing). Instead, it is undisputed U-Park has *never* been sued for injuries on Lot 13, with the record lacking any other evidence of past ice problems in Stall 153. No evidence supports a theory of liability based on constructive notice.

The Ackermans failed to adduce any admissible evidence to support the first element of their prima facie claim for premises liability: "that [U-Park] either created the condition, knew of the condition, or by exercise of reasonable care would have discovered the condition (should have known)." *Edwards*, 883 N.W.2d at 43. Because the Ackermans are "unable to present evidence to establish an essential element of [their claim], summary judgment on the claim is appropriate." *St. Jude Med.*, 250 F.3d at 595 (quoting *Celotex*, 477 U.S. at 323).

Based on the foregoing,

1. Defendant U-Park, Inc.'s "*Daubert* Motion in Limine and Request for Hearing" (Filing No. 54) is granted without a hearing.
2. U-Park's Motion for Summary Judgment (Filing No. 51) is granted without a hearing.
3. A separate judgment will be entered in accordance with this motion.

Dated this 20th day of March 2019.

> BY THE COURT:
>
> Robert F. Rossiter, Jr.
> United States District Judge